[No. S079179. Oct. 21, 2010.]

THE PEOPLE, Plaintiff and Respondent, v.
ROBERT ALLEN BACON, Defendant and Appellant.

## COUNSEL

Mark D. Greenberg, under appointment by the Supreme Court, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Ronald S. Matthias, Glenn R. Pruden and Catherine McBrien, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**KENNARD, J.**—A jury found defendant Robert Allen Bacon guilty of first degree murder (Pen. Code, §§ 187, 189)[1] and found true the special circumstance allegation that he intentionally killed the victim by means of lying in wait (§ 190.2, subd. (a)(15)). The jury found him guilty also of forcible rape (§ 261, subd. (a)(2)) and forcible sodomy (§ 286, subd. (c)(2)). Defendant waived his right to a jury trial on the additional special circumstance allegation that he was previously convicted of murder (§ 190.2, subd. (a)(2)), and the trial court found that he was so convicted.

At defendant's penalty trial, the jury returned a verdict of death. The trial court denied defendant's motions for a new trial (§ 1181) and for modification of the penalty (§ 190.4, subd. (e)), and it sentenced him to death. This appeal is automatic. (Cal. Const., art. VI, § 11; § 1239, subd. (b).)

We affirm the judgment.

### Introduction

Deborah Sammons was brutally murdered and her body was placed in the trunk of her car, which defendant tried to conceal by driving the car into a slough. The last persons Deborah Sammons saw on the night of her murder were defendant and her husband, Charles (Charlie) Sammons, from whom she had recently separated, and who, along with defendant, was charged with her murder. Defendant and Charlie Sammons both admitted that Charlie had asked defendant to kill his wife and that each of them had taken part in disposing of the body and concealing evidence of her murder. But their accounts of the murder itself varied widely, with each casting the other as the actual killer. The victim's blood was found on the shoes of both men, but physical evidence further linking defendant to the victim was the presence of his semen in her vagina. Defendant had never met the victim before the night of the murder.

Defendant and Charlie Sammons were tried separately. Defendant was tried first, and, at his trial, Charlie Sammons testified for the prosecution.[2]

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] After defendant's conviction, the prosecution dismissed the only special circumstance allegation (lying in wait) charged against Charlie Sammons, who then pleaded no contest to first degree murder and received a sentence of 25 years to life.

The prosecutor's theory was that both defendant and Charlie committed the murder, and that defendant had also raped and sodomized the victim. The defense theory was that Charlie was the sole killer because he had the stronger motive due to his jealousy and anger towards his estranged wife. The defense contended that defendant's sexual acts with the victim before her murder were consensual.

## I. FACTS

### A. Guilt Phase

#### 1. The prosecution's case

##### a. Discovery of the body

Around midnight on October 26, 1995, two California Highway Patrol officers discovered the body of Deborah Sammons in the trunk of a white Mercury Sable car that appeared to have been abandoned just off Grizzly Island Road in Solano County. The officers arrived in response to the call of a local man who had driven to Grizzly Island that night to fish. The man had first seen the white car on Grizzly Island Road when it had passed his car at high speed. On reaching the place on the road where a bridge crosses Montezuma Slough, the man found the white car at the edge of the slough with its engine running and its lights on. As recounted below, defendant ultimately confessed to police that he tried to drive the car into the slough to sink it and conceal the body in the trunk, but the car became stuck on the dirt embankment.

By running a check of the license plate, the officers determined that the car was registered to a married couple, Charles and Deborah Sammons. In preparation for towing and impounding the car, the officers conducted an inventory search. Using the keys from the ignition, they opened the trunk and discovered Deborah Sammons's body.

##### b. Investigation leading to the arrests

At the time of her murder, Deborah Sammons had separated from her husband Charlie and was having a romantic relationship with Bill Peunggate. She had begun the affair with Peunggate while she was still living with Charlie. Charlie and Peunggate had come to blows in the summer of 1995 when Charlie learned of the affair. Deborah told Peunggate that she intended to divorce Charlie.

Deborah and Peunggate had planned to go shopping together on the evening of October 26 (the day of the murder). In the afternoon, however, Deborah called Peunggate and told him that, at Charlie's request, she was first going to Charlie's house in Vacaville to take care of some bills. Deborah's timecard from her employer showed that she left work at 5:28 p.m. Around midnight, when Deborah still had not shown up for their planned shopping trip, Peunggate drove to Charlie's house. Charlie answered the door; he appeared to have just taken a shower. Peunggate used the phone, but neither of the men discussed Deborah's whereabouts.

About 6:00 a.m. on October 27, Solano County Sheriff's deputies visited Charlie Sammons at his house to tell him that his wife was dead. Initially he appeared shocked at the news, but, according to one of the officers, his shock "lasted not more than a minute," and he resumed cooking his breakfast. When asked whether or not he had been involved in the death of his wife, he responded, "Not quite." Based on that response, the officers asked for and received Charlie's permission to search his home. On the washing machine in the garage, they discovered a couple of drops of what appeared to be blood, which tested positive with Hemastix, a testing chemical. The officers told Charlie to accompany them to the station for further questioning, and he began to put on a pair of tennis shoes. Noticing bloodstains on the tennis shoes, one of the officers seized them. Subsequent DNA testing revealed that the blood was Deborah Sammons's.

On October 28, the day after Charlie Sammons was arrested, sheriff's deputies obtained a warrant for and searched his house. In the master bedroom, they discovered numerous traces of blood, including a smear on the bedframe, a drop inside the dresser cabinet, a smear on the dresser, and small stains on the closet door. In the living room, they found small bloodstains on the brickwork in front of the fireplace. Inside the fireplace, they discovered burnt fabric and the underwire and clasps of a bra. In the kitchen, they found a single-edged, wood-handled steak knife in the dishwasher.

After Charlie made statements to investigators implicating defendant, sheriff's deputies obtained a warrant for and searched defendant's residence, where they found and seized a tire iron.

### c. *Autopsy and sexual assault examination*

The victim's body was clad in a floral print dress, a short sleeve blouse, and a half-slip, but no other underclothing. It bore three types of injuries: strangulation, blunt force, and sharp force. The strangulation injuries consisted of multiple ligature furrows on the neck and hemorrhaging of the eyes. The blunt force injuries included a broken nose and lacerations on the

eyebrow and the bridge of the nose. On the face there was a rectangular bruising pattern that, according to the trial testimony of Dr. Brian Lee Peterson, the pathologist who performed the autopsy, "matched very nicely the general width and shape" of the tire iron that had been found in defendant's apartment.

The sharp-force injuries included two stab wounds to the face and two stab wounds to the left side of the chest, one of which went through the lung and into the abdomen, and the other of which penetrated the heart, injuring the ventricle. According to Dr. Peterson, the steak knife that was found in the dishwasher at Charlie Sammons's house could have been used to inflict all of the stab wounds.

Dr. Peterson took swabs from the mouth, vagina, and rectum for evidence of rape, although he found no evidence of trauma to the victim's vagina or rectum. The swabs were tested by a criminalist, who found evidence of spermatozoa on the vaginal swab. The swabs were also sent to a Department of Justice laboratory in Berkeley for DNA analysis. The laboratory confirmed the presence of spermatozoa and performed two rounds of DNA testing on it. The testing excluded Bill Peunggate (Deborah Sammons's boyfriend at the time of the murder) and Charlie Sammons, but not defendant, as possible sources of the sperm. DNA analysis of the bloodstain on defendant's shoe excluded Charlie Sammons, Peunggate, and defendant as possible sources, but included the victim.

Elizabeth Ann Cassinos, a sexual assault nurse examiner, performed a colposcopic examination of the genital and anal areas of the victim's body. (A colposcope is a microscope that magnifies 15 times normal vision.) Cassinos discovered an abrasion or slight tear at the edge of the vaginal opening. This type of injury could be consistent with consensual sexual relations. The victim's anal cavity exhibited "more trauma" than the vaginal area. Past the sphincter, the anal cavity was purple and bruised looking on the right-hand side, which was consistent with blunt force trauma to the rectum caused by something being forced in from the outside. Cassinos did not offer an opinion as to whether the condition of the victim's genital and anal areas was the result of consensual or nonconsensual sexual relations.

d. *Charlie Sammons's testimony*

Charlie Sammons testified for the prosecution. At the time, he was also charged with the murder of Deborah Sammons, and he was in custody

awaiting a separate trial. His attorney had approached the prosecution about Charlie's testifying, but Charlie had made no plea agreements or deals with the prosecution. Charlie hoped, however, that the prosecution would show him some consideration after the conclusion of defendant's case.

On the day of the murder, Charlie and Deborah Sammons had been separated for about a month. Charlie was living at the Vacaville house that the couple had formerly shared. Charlie had been suffering from multiple sclerosis (MS) for about 17 years, with varying degrees of impairment over that time. When he testified at defendant's trial, Charlie was using a wheelchair, but at the time of the murder, about three and a half years earlier, he had been able to walk.

Charlie had met defendant through Charlie's daughter, who knew defendant's stepmother. On the day of the murder, defendant was helping Charlie paint the house and had been there for three days, working on the project. During the first day of painting, Charlie mentioned that he and his wife were separated because of "sexual problems," namely, she no longer wanted to have sex with him. Charlie told defendant, "I'd like to have her out of the picture." Defendant replied that "he could take care of it for a price." Charlie thought defendant "was joking around" because defendant was laughing when he said it.

Charlie had called Deborah several times that week, asking her to come to the house to pay the bills, something she often did even after their separation. She finally agreed, and Charlie told defendant she was going to come. Defendant replied that, upon her arrival, he would go to the bedroom to wait, and that, if Charlie "wanted her taken care of," he should knock on the door as a signal. Charlie testified that he did not really know what defendant meant and that he thought defendant was still joking.

Deborah arrived about 6:00 p.m. on the day of the murder, and for several hours she and Charlie talked while she paid the bills at the kitchen table. Charlie asked whether she was coming back, and she responded she did not know, which was her usual response to this question. When she finished paying the bills, Deborah went to the bedroom to put away the receipts and the checks. Charlie then heard a scream "like she [had] seen a mouse." Because the scream was not loud, Charlie waited a few minutes, then yelled to ask whether everything was all right. Hearing no response, he went to the bedroom and saw defendant beating Deborah. Defendant held her up with one hand around her neck. She was bleeding from the side of her head and

begged Charlie to help her. When Charlie asked defendant what he was doing, defendant pointed a gun at Charlie and told him to go back to the kitchen.

Charlie returned to the kitchen and started to go to the phone, but defendant, who was still in the bedroom, yelled, "I told you not to try to do anything." Charlie testified that "it was like [defendant] knew everything I was doing," and he said he was too scared to leave the house to seek help. After about five minutes, Charlie returned to the bedroom to see what was happening. Defendant was bent over the bed, standing over Deborah, who was bleeding. Charlie did not know whether she was alive. He saw her bra or panties or pantyhose near the end of the bed. Defendant again told Charlie to go back to the kitchen, and again he complied. A few minutes later, defendant called him back to the bedroom. Deborah was on the bed, dressed, apparently dead. Defendant told Charlie to help him wrap the body in a tarp, which Charlie obtained from the backyard. After they had wrapped Deborah's body, defendant told Charlie to help him put it in the trunk of a red car in the garage. Charlie did so, and defendant asked him where they could dump the body. When Charlie had trouble thinking of a place, defendant threatened to shoot him. Charlie then thought of Grizzly Island, because he had previously towed cars from there.

Defendant told Charlie to lead the way. Charlie drove the red car, with Deborah's body in the trunk, and defendant followed in Deborah's car, the white Mercury. When they reached Grizzly Island Road, defendant flashed his lights for Charlie to stop. Defendant told Charlie to help him put the body in the white car. They removed the body from the tarp and threw the tarp over the side of a hill. Defendant then drove the white car, now containing Deborah's body, off the side of a bridge towards the water. Defendant rejoined Charlie, who was waiting in the red car, and told him, "Let's go back and I'll clean up the mess."

On cross-examination, Charlie acknowledged that, around the time of the murder, he was not confined to a wheelchair. Although Charlie had been receiving Social Security disability payments, he was doing construction jobs, such as installing sprinkler systems. He had also constructed a patio cover in his backyard, a task requiring hammering and sawing.

Charlie also acknowledged that he was jealous and upset about Deborah's affair with Peunggate, and that he had asked people to watch her house and her place of work to keep track of her activities. During the last period in which Charlie and Deborah lived in the house, she had refused to have sex

with him, and they slept in different bedrooms. Deborah moved out of the house because she was tired of refusing his demands for sex, and her refusals had angered him.

### e. *Defendant's statements to investigators*

Defendant's videotaped custodial interview, which occurred around 11:00 a.m. on October 28, 1995, was introduced through the testimony of Solano County Sheriff's Detective Patrick Grate, the interrogating officer. The video-tape was played to the jurors, who were given transcripts that the parties stipulated were true and accurate, and which contained a few statements that had been inadvertently deleted from the videotape.

Detective Grate began the interview by informing defendant of his rights under *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602], and defendant agreed to talk. Grate asked defendant about his schedule during the last week, and defendant said he had taken Wednesday and Thursday off from work to help Charlie Sammons paint his patio. Grate told defendant, "We think Charlie offed his wife," and asked defendant whether he knew her. Defendant initially denied ever meeting her. Grate then told defendant that Charlie had said defendant had helped Charlie move the body. Grate said that DNA testing was being done, and he urged defendant to tell his version of what had happened that night. Defendant eventually acknowledged that Deborah had come to Charlie's house on Thursday night about 6:00 p.m., and he said, "You're gonna find my semen samples in her . . . . Cause I fucked her."

Detective Grate told defendant that Charlie had said that defendant had committed the murder all on his own, for reasons unknown to Charlie. In response, defendant told this story: Defendant saw Deborah arrive and was immediately attracted to her. He overheard Deborah and Charlie in the kitchen discussing their separation. Deborah told Charlie she did not want the house, but she also did not want other women living there because they would take things that belonged to her. Charlie then went to the garage, which defendant took as his "opportunity to check her out." After some conversation lasting "five minutes at the most," inexplicably ("I don't know how it happened or why it happened.") and quickly ("next thing I know"), defendant and Deborah began to have sex. Charlie did not interrupt them, and, after they had finished engaging in sex (which took about 10 or 15 minutes), defendant went back outside to continue painting the house.

About 15 minutes later, Charlie yelled for defendant to come inside. Charlie had blood on his hands and shirt, and defendant "knew" what had happened. Defendant went to the bedroom and saw Deborah's dead body on the bed. When asked to describe the condition of the body, defendant said, "I didn't want to fuck her" and "there was blood everywhere." Based on his prior conversations with Charlie, defendant assumed Charlie had killed her because they were separating and "she was gonna take everything."

Charlie told defendant that if he did not help him move the body, Charlie would call defendant's father and tell him that defendant had just killed Deborah. Defendant and Charlie then moved the body onto a tarp. Defendant got Deborah's blood on his shoes when he stepped on the tarp. Charlie tossed something in the fireplace, which might have been rags or a blanket or a sheet. Defendant eventually admitted that he helped Charlie to burn Deborah's underwear and to clean the bloody sheets.

They put the body in the trunk of the red car, which Charlie drove. Defendant followed in the white car. At some point, they stopped; Charlie switched the body into the white car; and defendant tried to drive the car into the slough, but it got stuck on a big dirt hump. Charlie drove defendant home. At some point, defendant washed his bloody clothes at Charlie's house, which was how the blood got on the washing machine.

At this point in the interview, Detective Grate left defendant alone in the room with the videocamera still recording. Defendant engaged in an obscenity-filled soliloquy in which he cursed Charlie for getting him involved and for pinning the crime on him. He also wondered aloud why Charlie had killed Deborah. Detective Grate returned to the interview room and announced that the district attorney was going to charge defendant with "rape/murder." Grate explained that the rape charge was based on the improbability of defendant's story that Deborah had engaged in consensual sex five minutes after meeting him for the first time. Grate urged defendant to tell him anything more that might clarify what had happened that night.

Defendant then said that Charlie had asked him to kill Deborah. Defendant maintained that he never said he would kill her but acknowledged that he believed Charlie assumed he would. After Deborah arrived, Charlie left the house to go to the store, saying, on his way out the door, that defendant "knew what had to be done." Defendant claimed that he did not realize the significance of Charlie's comment, despite his earlier conversation with Charlie about killing Deborah. After Charlie left, defendant talked to Deborah

for about five minutes. The "next thing [he] knew," he was kissing her, and "she didn't struggle." They ended up in the bedroom, where defendant performed oral sex on her. They engaged in vaginal intercourse and then in anal intercourse, when she said she did not mind it. Defendant adhered to the rest of his earlier story that Charlie killed Deborah all on his own and that defendant played no role beyond helping to dispose of the body and clean up the evidence.

### f. *Testimony of jailhouse informant*

Martin L'Esperance testified about statements defendant had made to him about the murder while they were both prisoners in the Solano County jail. L'Esperance had many theft-related convictions and was then serving a sentence for either petty theft or robbery. Defendant told L'Esperance he had "stabbed a lady to death" in "the back room" of her house in Vacaville, had "fucked the bitch in the ass," and had made her husband help him get rid of the body. Defendant also said that murder produced a better "high" than shooting methamphetamine and that "sex after death" was "better than regular sex." Defendant did not say whether his sex acts with the victim occurred before or after her death.

Almost a year after hearing defendant's statements, L'Esperance decided to go to the authorities with the information because Charlie Sammons was still in custody and L'Esperance thought Charlie was being imprisoned for a crime he had not committed. At the time, L'Esperance had a case pending, but he had already entered into a plea agreement for it. He said he neither asked for nor received any consideration for his pending case when he reported defendant's statements.

### 2. *The defense case*

Through the testimony of Charlie Sammons's relatives and neighbors, the defense sought to establish that he had been physically capable of killing his wife and that he was motivated to do so because of his anger over their separation.

Several witnesses testified that although Charlie had MS, he was a healthy and active person around the time of the murder. Charlotte and David Hedrick had been neighbors of Charlie and Deborah Sammons for 12 years. They were upset that Charlie was defrauding the government by drawing Social Security disability payments for his MS while doing construction jobs. Intending to reveal this fraud, David Hedrick had taken photographs of Charlie cutting wood with a power saw and nailing boards while standing on a ladder. Deborah's sister, Lynette Holsey, testified that she saw Charlie digging trenches two feet deep and 20 feet long to install sprinkler systems.

Several witnesses testified about Charlie Sammons's jealousy and anger toward Deborah. Charlotte Hedrick testified that Charlie was jealous and suspicious of his wife. Lynette Holsey and Sheila Shelley, a family friend, testified that Charlie had people checking to see whether Deborah was really at work. Holsey said Charlie told her that, if he could not have Deborah, no one could. Family friends Cletus June Wilkerson and her husband, Howard Wilkerson, each testified they heard Charlie arguing with Deborah, and he was so angry he twice said, "I'm gonna kill her."

To counter Dr. Peterson's testimony that Deborah's facial bruises matched the tire iron found in defendant's dwelling, pathologist Dr. Paul Hermann testified that, based on Deborah's autopsy reports and photographs, her blunt force injuries could have been inflicted by blows with the barrel of a handgun that belonged to Charlie Sammons and that had been found in a cabinet under a bathroom sink in the Sammons's house. Dr. Hermann acknowledged that since the handle of the tire iron was about the same size as the slide on the gun, he could not rule out the tire iron as the source of the injuries. But he thought it more likely that the gun had caused the injuries because he would have expected to see more damage to the bones of the face if the tire iron had been used. Deborah's nose was broken, but the bones of the nose are more fragile than the other bones of the face. As to the prosecution's medical testimony that there were microabrasions to Deborah's vagina, Dr. Hermann stated that these could have been caused by the rubbing of underwear or sanitary pads.

Charles Morton, a forensic scientist and criminologist, examined Charlie Sammons's handgun for signs of blood. Inside the barrel was a small reddish stain about two millimeters long. A test by Morton indicated that the stain could be blood but did not exclude mold or bacteria. Later DNA testing failed to detect any quantity of human DNA.

DNA analyst Lisa Calandro determined that the DNA of the blood found under Deborah's fingernails matched Deborah's DNA but not defendant's DNA or Charlie's DNA.

Kathy Allison, one of Charlie Sammons's neighbors, testified that on the evening of the murder, while driving by his house, she saw Charlie out front talking to an elderly man while Deborah Sammons's white car was in the driveway. This defense was presented to corroborate defendant's statement during the custodial interview that Charlie had left the house at one point, which, according to defendant, had given defendant and Deborah an opportunity to engage in consensual sex.

### B. *Trial on Prior-murder Special-circumstance Allegation*

Defendant waived his right to a jury trial on the prior-murder special-circumstance allegation, which had been bifurcated from the guilt phase. Based on the prosecution's documentary evidence, the trial court found that on June 17, 1983, defendant had been convicted in Arizona of second degree murder, and that the prior-murder special-circumstance allegation was therefore true.

### C. *Penalty Phase*

#### 1. *Prosecution case*

##### a. *Defendant's prior murder in Arizona*

The prosecution presented evidence of the facts underlying defendant's Arizona murder conviction. Sheriff's deputies from Pima County, Arizona, testified about the murder of John Noble, who, around noon on October 26, 1982, was found dead in bushes beside an interstate highway. Noble's autopsy revealed slash wounds to his neck and numerous blunt force injuries to his head and upper body. (At the conclusion of the penalty phase, the parties stipulated that the cause of Noble's death was "a sharp injury to the right neck that pierced his right external carotid artery.") At the scene, investigators found a broken beer bottle that was covered with blood.

Around 9:20 a.m. that day, a deputy sheriff had stopped and questioned two hitchhikers at that same location. One was the victim, John Noble; the other was defendant. Between 10:15 and 10:30 a.m., several drivers on the interstate reported seeing, at the side of the highway, one man hitting and kicking another man who was on the ground. When sheriff's deputies arrived, they found Noble's dead body and arrested defendant, who was about 100 feet from the body. Defendant appeared to be under the influence of alcohol or drugs.

At the station, defendant waived his rights under *Miranda v. Arizona, supra*, 384 U.S. 436, and spoke to an investigating officer. Defendant did not have many injuries, but he did have dirt and blood on his person. He also had the murder victim's wallet. Defendant initially denied any involvement with the murder, but ultimately he confessed that he had fought with Noble. Defendant said he had been hitchhiking with his dog, who was pregnant. He had met Noble, a fellow hitchhiker, and drank some alcohol with him. Noble said they might find work in Phoenix as grooms at a racetrack. Noble lay down for a nap, and defendant left to catch a ride, but he returned to get the piece of paper from Noble's wallet on which the job address was written. As

defendant was preparing to get the wallet, defendant's dog woke Noble, who lashed out and kicked the dog. Defendant warned Noble about kicking the pregnant dog, but Noble kicked the dog again, and defendant fought with him.

During the interview, defendant gave several different accounts of the fight. At one point, he said he hit Noble in the neck and thought he cut Noble's neck because Noble started bleeding and fell down. At another point, however, defendant said that Noble had cut his neck by falling on the broken beer bottle. No fingerprints were ultimately recovered from the bottle. But when defendant was asked whether his fingerprints would be found on it, he said they would because he had picked up the bottle and thrown it away. Defendant said that he never intended to steal Noble's wallet and that he had merely wanted the job information.

### b. *Parole violation*

For killing Noble, defendant pleaded guilty to second degree murder and robbery, and he was sentenced to prison. He was paroled in April 1994. On February 24, 1995, during a parole search of defendant's bedroom, his parole officer found a loaded .25-caliber pistol under defendant's pillow. In the drawer of a table beside the bed, additional ammunition for the gun was found. Defendant denied the gun was his and said he had no idea how it had gotten there. Defendant was returned to prison for violating his parole. He was again released on July 24, 1995, after which he failed to report to his parole officer. (According to defendant's police interview, he came to Cal. in Aug. 1995. Deborah Sammons was murdered on the evening of Oct. 26, 1995.)

### 2. *Defense case*

Several of defendant's relatives testified about his impoverished and unstable childhood, and about his abuse at the hands of his stepfather, Bill Garlinghouse.

Defendant's mother, Kathleen Scott, was continuously hospitalized between the ages of six and 12 for a severe heart condition and as a result received little formal education. When she was 16, defendant's mother married Robert Bacon, a sailor in the United States Navy, and moved with him from Washington State to California. She became pregnant with defendant as the result of an affair with another man while her husband was at sea. Robert Bacon realized that the child was not his, and the couple separated. Defendant's mother moved back to Washington and for a time lived again with her family. She became a prostitute and was jailed for about six months.

During this time, defendant, then six months old, was placed in foster care with Julie Joy Waldrop, the sister-in-law of defendant's maternal grandmother. When Waldrop first received him, defendant was a "pitiful" baby. He was "catatonic," could not sit up, and had no facial expression. Although defendant made progress under Waldrop's care, defendant's mother regained custody of him after about six months.

Defendant's mother then had a series of unstable relationships and eventually married Bill Garlinghouse, who brought with him three children from previous relationships. Defendant's mother told her sister, Glenna Healy, that Garlinghouse beat defendant frequently and put cigarettes out on him. She also said that defendant had told her that Garlinghouse had sodomized him. Healy had observed bruises on defendant's face and arms and a cigarette burn on his arm.

Ruth Garlinghouse, Bill Garlinghouse's sister, came to know defendant when she was about 13 or 14 and defendant was about three or four. She was a babysitter for her brother's family. When Garlinghouse and defendant's mother were dating, he treated defendant well. But after they were married, Garlinghouse began to pick on defendant and would slap him periodically. By the time defendant was four or five, Ruth began to notice cigarette burns on him, as well as on Garlinghouse's younger son Billy, who was about the same age. At one point, defendant looked like he had been "slammed into a wall," and the whole left side of his face was cut and severely bruised. On another occasion, when defendant was about six, Ruth saw Garlinghouse beat defendant severely with a board that was some 18 inches long, a half-inch thick, and three inches wide.

Bill Garlinghouse's daughter, Elizabeth, and Billy also testified about how their father abused them and defendant while they were growing up in his household. To inflict beatings, Garlinghouse generally used a belt, but sometimes he had the victim pick a switch from a tree for him to use. Defendant was punished more frequently, and often with more force, than the other children. Garlinghouse sexually abused Elizabeth. He shot and killed many of the family pets, afterwards forcing the boys to bury them.

Garlinghouse moved the family frequently from town to town. Defendant's mother eventually left Garlinghouse after he hit her in the chest, which caused her to have a heart attack. While she was hospitalized, Garlinghouse moved out of the house, taking his children but leaving defendant behind. When defendant was 11 or 12 years old, his mother reunited with her former husband, Robert Bacon. About a year later, they at last told defendant that Robert Bacon was not his biological father, which caused defendant to become very angry. Like Garlinghouse, Robert Bacon moved the family frequently. Defendant eventually ended up in juvenile institutions.

## II. DISCUSSION

### A. *Guilt Phase Issues*

#### 1. *Exclusion of defense evidence*

Sustaining the prosecutor's relevancy objection, the trial court excluded a note, written in defendant's handwriting, that contained the victim's name, her work address, and an unidentified telephone number. Defendant asserts the note was relevant and admissible evidence that would have corroborated his claim of consensual sex with the victim. He contends that the exclusion of the note violated state law and his rights under the Sixth, Eighth, and Fourteenth Amendments to the federal Constitution.[3] As we conclude below, the trial court did not err in excluding the note.

During cross-examination of the criminalist who helped collect evidence during the search of Charlie Sammons's house, defense counsel asked about some items, apparently belonging to defendant, that were found in one of the bedrooms in the house. One item was an athletic bag containing men's shaving items and a note on which were written a name, an address, and a phone number. The prosecution objected to admission of the note for lack of relevance, and the trial court heard argument on the issue outside the jury's presence. Defense counsel made an offer of proof that the note was found in defendant's bag and bore, in defendant's handwriting, the name of the victim, her work address, and a phone number that was as yet unidentified. Defense counsel argued that the note was relevant to show that on the night of the murder the victim had voluntarily given her personal contact information to defendant, which in turn could support the defense version of events that the victim consented to sexual acts with defendant. The prosecutor objected that, without further evidence, the mere presence of the victim's name and contact information in defendant's handwriting on the note did not show that she had

---

[3] Regarding this claim and other claims raised on appeal, defendant contends the asserted error or misconduct violated several constitutional rights. In many instances in which defendant raised the issues at trial, however, he failed to explicitly make some or all of the constitutional arguments he now asserts on appeal. Unless otherwise indicated, his appellate claims either required no action by him to preserve them, or they involved application of the same facts or legal standards defendant asked the trial court to apply, accompanied by a new argument that the trial error or misconduct had the additional legal consequence of violating the federal Constitution. "To that extent, defendant has not forfeited his new constitutional claims on appeal." (*People v. Guerra* (2006) 37 Cal.4th 1067, 1084, fn. 4 [40 Cal.Rptr.3d 118, 129 P.3d 321].) On the merits, no separate constitutional discussion is required, or provided, when rejection of a claim that the trial court erred on the issue presented to that court necessarily leads to rejection of any constitutional theory or " 'gloss' " raised for the first time here. (*People v. Boyer* (2006) 38 Cal.4th 412, 441, fn. 17 [42 Cal.Rptr.3d 677, 133 P.3d 581].)

voluntarily given him the information. The trial court agreed with the prosecutor's objection, observing that an equally reasonable inference was that Charlie had provided the information when he solicited defendant to kill his wife. The court left open the possibility, however, that the defense could seek admission of the note after Charlie Sammons had testified and was questioned about whether he had given defendant the information in question.

When Charlie Sammons testified, he denied giving defendant any information about his wife, such as a phone number or an address. The defense then renewed its request to admit the note, and the trial court held another hearing outside the presence of the jury. Since the first hearing on the note, the prosecutor had obtained phone company records, and now made an offer of proof that the phone number on the note was *not* linked to the victim. The trial court again denied the motion to admit the note, explaining that "the defense has not established a sufficient foundation to conclude, other than by pure speculation, that the victim is the volunteer source of information on the note." The court also explained that, even assuming for the sake of argument the foundational fact that the victim had been the source of the information on the note, it would be unreasonable, without an explanation as to *why* the information was given to defendant, to infer that the sexual contact between defendant and the victim was consensual.

Defendant contends that admission of the note would have supported his version of events—namely, that the victim consented to their sexual acts—which would have been helpful to him not only on the sexual assault charges but also on the murder charge. As defendant puts it, "it would be paradoxical to the point of absurdity to believe that a man would take the trouble to induce (or seduce) the consent of a woman he intended to murder immediately afterwards in any event." As recounted, the trial court gave two reasons for not admitting the note: (1) defense counsel had not met his burden, under Evidence Code section 403, subdivision (a)(1), of establishing the foundational fact that the victim had voluntarily given him the information on the note, and (2) even if that foundational fact were established, it was not relevant, under Evidence Code section 210, to the issue of whether defendant and the victim had engaged in consensual sex. We consider the foundational issue first.

 When the relevance of proffered evidence depends on the existence of a preliminary fact, the proponent of the evidence has the burden of producing evidence as to the existence of that preliminary fact. (Evid. Code, § 403, subd. (a)(1).) The proffered evidence is inadmissible unless the trial court finds sufficient evidence to sustain a finding of the existence of the preliminary fact. (*Ibid.*; see also *People v. Marshall* (1996) 13 Cal.4th 799, 832 [55 Cal.Rptr.2d 347, 919 P.2d 1280] ["the trial court must determine whether the

evidence is sufficient to permit the jury to find the preliminary fact true by a preponderance of the evidence"].) "The decision whether the foundational evidence is sufficiently substantial is a matter within the court's discretion." (*People v. Lucas* (1995) 12 Cal.4th 415, 466 [48 Cal.Rptr.2d 525, 907 P.2d 373]; accord, *People v. Guerra, supra,* 37 Cal.4th 1067, 1120.)

Here, the preliminary fact for which defendant had the burden of producing evidence was that murder victim Deborah was the source of the information on the note. Although some of that information was *about* Deborah (her name and work address, but apparently not the telephone number), the defense produced no evidence adequately supporting an inference that she was the source of the information. Significantly, the note was in *defendant's* handwriting. As the trial court observed, if the victim had provided the information, one would normally expect the note to be in *her* handwriting. In his testimony, Charlie Sammons denied giving his murdered wife Deborah's address or phone number to defendant. We assume the truthfulness of Charlie's testimony on this point for the purposes of the Evidence Code section 403 analysis. (See Assem. Com. on Judiciary com., 29B pt. 1 West's Ann. Evid. Code (1995 ed.) foll. § 402, pp. 356–357 [trial court does not resolve conflicts in the evidence submitted on preliminary facts questions determined under Evid. Code, § 403]; Assem. Com. on Judiciary com., 29B pt. 1 West's Ann. Evid. Code, *supra,* at p. 403 [same]; see also 3 Witkin, Cal. Evidence (4th ed. 2000) Presentation at Trial, § 52, p. 85 [trial court cannot weigh the evidence and resolve the conflict against admissibility].) But even so assuming, Charlie's testimony was merely *compatible with* the theory that Deborah had supplied the information; it did not specifically show that she had done so. Charlie was not the only possible source of the information. As the trial court observed, Deborah had recently lived in the house, and defendant (who had spent several days at the house) could have come across documents there containing her personal information. The trial court therefore acted within its discretion in finding defendant's showing for this preliminary fact too weak to meet his burden under Evidence Code section 403.

Because the trial court did not err in excluding the note on the basis of Evidence Code section 403, we need not evaluate the court's alternate rationale for exclusion, namely, that, even assuming the foundational fact, the note was not relevant to the issue of consensual sex. (See Evid. Code, § 210 [" 'Relevant evidence' means evidence . . . having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action."].) In any event, we see no abuse of discretion in the trial court's relevancy analysis. As the court reasoned, even if what had been found in defendant's bag was an item clearly likely to have been volunteered by the murder victim, such as her business card, it would have strained common sense to conclude that the presence of such an item indicated an agreement to engage in consensual sex.

Finally, assuming for the sake of argument that the trial court erred in excluding the note, we see no prejudice. Defendant merely speculates that admitting the note would have helped his defense. Had the note been admitted, the jury might have considered it as supporting defendant's statement that he and the victim engaged in consensual sex within five minutes of their meeting for the first time (even though none of defendant's various accounts of events described any such exchange of personal information). But in light of admissions by both defendant and the murder victim's husband, Charlie, that they discussed having defendant kill Deborah, the jury was more likely to have considered the note as supporting the prosecution's theory that Charlie had given Deborah's personal information to defendant to facilitate a murder for hire. In any event, the possible exculpatory value of the note was slight when viewed in light of the strong evidence of defendant's guilt, and we therefore conclude that its exclusion was harmless.[4]

## 2. *Motion to suppress defendant's statements*

Two days after the murder, defendant was interviewed by a sheriff's detective. (See, *ante*, at pp. 1094–1096.) Before trial, defendant challenged the admissibility of a large portion of this interview under *Miranda v. Arizona, supra*, 384 U.S. 436 (*Miranda*), arguing that the interrogating officer had failed to honor defendant's request for counsel. After a hearing on the matter, the trial court rejected defendant's claim. Defendant renews his argument on this appeal. As we conclude below, defendant's *Miranda* rights were not violated. Viewed in context, his statement ("I think it'd probably be a good idea for me to get an attorney") was an ambiguous or equivocal reference to an attorney, which did not require the interrogating officer to cease questioning him. (*Davis v. United States* (1994) 512 U.S. 452, 459 [129 L.Ed.2d 362, 114 S.Ct. 2350] (*Davis*).)

 Under *Miranda* and its progeny, "a suspect [may] not be subjected to custodial interrogation unless he or she knowingly and intelligently has waived the right to remain silent, to the presence of an attorney, and, if indigent, to appointed counsel." (*People v. Cunningham* (2001) 25 Cal.4th

---

[4] Defendant contends that prejudice from the note's exclusion must be assessed by the standard for federal constitutional error, namely whether the error was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 23–24 [17 L.Ed.2d 705, 87 S.Ct. 824].) We reject defendant's attempt "to inflate garden-variety evidentiary questions into constitutional ones." (*People v. Boyette* (2002) 29 Cal.4th 381, 427 [127 Cal.Rptr.2d 544, 58 P.3d 391].) The proper standard for review of the assumed evidentiary error here is that for state law error under *People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243] (whether "it is reasonably probable that a result more favorable to [defendant] would have been reached in the absence of the error"). As defendant acknowledges, we have held that only evidentiary error amounting to a complete preclusion of a defense violates a defendant's federal constitutional right to present a defense. (*People v. Boyette, supra*, 29 Cal.4th at pp. 427–428.)

926, 992 [108 Cal.Rptr.2d 291, 25 P.3d 519].) If at any point in the interview the suspect invokes the right to remain silent or the right to counsel, "the interrogation must cease." (*Miranda, supra*, 384 U.S. 436, 474; see *id.* at pp. 444–445, 473–475, 479.) But, as the high court has stated, an officer is not required to stop questioning a suspect when "a suspect makes a reference to an attorney that is ambiguous or equivocal." (*Davis, supra*, 512 U.S. at p. 459.) The suspect "must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." (*Ibid.*) *Davis* noted that "when a suspect makes an ambiguous or equivocal statement it will often be good police practice for the interviewing officers to clarify whether or not he actually wants an attorney," but declined "to adopt a rule requiring officers to ask clarifying questions." (*Id.* at p. 461.)

In reviewing a trial court's *Miranda* ruling, we accept the court's resolution of disputed facts and inferences and its evaluations of credibility, if supported by substantial evidence, and we independently determine, from the undisputed facts and facts properly found by the trial court, whether the challenged statement was illegally obtained. (*People v. Gonzalez* (2005) 34 Cal.4th 1111, 1125 [23 Cal.Rptr.3d 295, 104 P.3d 98].) Because what defendant here said during his police interview is undisputed, we engage in a de novo review of the legal question of whether the statement at issue was ambiguous or equivocal.

Defendant contends that on its face his statement ("I think it'd probably be a good idea for me to get an attorney.") is sufficiently clear to be understood as a request for an attorney. Defendant compares his statement to "similar locutions" that courts in other states and some federal appellate courts have held to be unambiguous and unequivocal invocations of the right to counsel under *Davis*. As defendant acknowledges, however, other state and federal courts have found similar statements to be ambiguous or equivocal. Because defendant's statement contains several ambiguous qualifying words ("I think," "probably," and "it'd"), we do not consider defendant's statement to be sufficiently clear in and of itself. (See *Davis, supra*, 512 U.S. at p. 455 [" 'Maybe I should talk to a lawyer.' "]; *People v. Stitely* (2005) 35 Cal.4th 514, 534 [26 Cal.Rptr.3d 1, 108 P.3d 182] [" 'I think it's about time for me to stop talking.' " (italics omitted)].)

Alternatively, defendant contends his statement was sufficiently clear given the circumstances of his interview. Accordingly, we turn to the details of defendant's questioning. (See *Davis, supra*, 512 U.S. at p. 459 [admissibility depends on what "a reasonable police officer in the circumstances would understand"]; see also *People v. Crittenden* (1994) 9 Cal.4th 83, 131 [36 Cal.Rptr.2d 474, 885 P.2d 887] [*Davis* analysis is conducted "in view of the

entire record"].) Here defendant's reference to an attorney occurred about 30 minutes into his interview with Detective Grate. Initially, defendant denied ever meeting the murder victim. But when Grate told him the investigators were conducting DNA testing, defendant said: "You're gonna find my semen samples in her . . . . Cause I fucked her." Defendant claimed that the sexual acts were consensual, but he gave no further details. Grate urged defendant to give him more information, asking, "What did he do, man? What the fuck did Charlie [Sammons] do?" This led to the following exchange:

Defendant: "I don't know. I don't know. I've been asking myself that same question since we've been in this room and you told me this. What the fuck did Charlie do? Oh, my God."

Grate: "Ain't no doubt you're in the wrong place at the wrong time."

Defendant: "(Positive response)"

Grate: "With the wrong people, man."

Defendant: "____. Yeah, I think it'd probably be a good idea . . ."

Grate: "Well listen, listen."

Defendant: ". . . for me to get an attorney."

Grate: "Alright. It's up to you."

Defendant: "____ tell me . . ."

Grate: "Hmm?"

Defendant: "Listen, what?"

Grate: "It's up to you if you, you know, if you want an attorney, I mean I'm, I'm giving you the opportunity to talk."

Defendant: "Well . . ."

Grate: "You know . . . _____"

Defendant: ". . . that's what you're gonna say. I mean talk to me, okay?"

Grate: "Hmm?"

Defendant: "Talk to me."

Grate: "Talk to you?"

Defendant: "Talk to me."

Considering the totality of this exchange, we conclude that defendant's reference to an attorney was equivocal or ambiguous. Defendant's "attorney" reference occurred during a rapid and sometimes confusing series of exchanges with Detective Grate. We note that defendant's phrase, "talk to me," is open to two possible interpretations. It could express defendant's willingness to talk to Grate or it could express what defendant thought Grate wanted him to do. This possible ambiguity is most evident the first time defendant used the phrase ("[T]hat's what you're gonna say. I mean talk to me, okay?") and perhaps explains Grate's puzzled response ("Hmm?"). Whatever ambiguity there might be in the first instance of "talk to me," however, is dispelled by defendant's use of the phrase two more times, which indicates that defendant was indeed asking Grate to talk to him, rather than parroting what he thought Grate wanted him to do. Furthermore, even if we assume for the sake of argument that all instances of "talk to me" were ambiguous, defendant's claim fails, because under *Davis*, a defendant's invocation of the right to counsel must be clear and unambiguous. (*Davis, supra*, 512 U.S. at p. 459.)

As a further alternative argument, defendant contends that, even assuming his reference to an attorney was ambiguous, Detective Grate went beyond asking for clarification to actively dissuading defendant from consulting counsel. Defendant acknowledges that we rejected a similar argument in *People v. Stitely, supra*, 35 Cal.4th at page 534. There, in response to the defendant's ambiguous reference to the right to silence, the officer stated: " 'It's up to you. Nobody ever forces you to talk. I told you that. I read you all that (untranslatable).' " (*Ibid.*) Defendant here contends that Grate's comment ("I mean I'm, I'm giving you the opportunity to talk.") is distinguishable from the language we analyzed in *Stitely* because Grate implied that consulting an attorney would be a waste of an opportunity to exonerate himself. But we see no substantial difference between this aspect here and in *Stitely*, and consequently we reject defendant's claim that he was "badgered into resuming the interrogation." (*Id.* at p. 536.)[5]

---

[5] Defendant also argues that the United States Supreme Court, in *Dickerson v. United States* (2000) 530 U.S. 428 [147 L.Ed.2d 405, 120 S.Ct. 2326], impliedly overruled the holding in *Davis v. United States, supra*, 512 U.S. at page 461, that the federal Constitution does not require the police to ask clarifying questions in response to an ambiguous reference to counsel. In *Berghuis v. Thompkins* (2010) 560 U.S. ___ [176 L.Ed.2d 1098, 130 S.Ct. 2250, 2260], the

Because there was no violation of defendant's *Miranda* rights, we need not address his lengthy analysis of how his case was prejudiced by the statements he made after his asserted invocation of the right to counsel. We note, however, that defendant's argument for prejudice is questionable. As defendant acknowledges, before his reference to an attorney, defendant had already told Detective Grate that on the night of the murder he had engaged in sex with the victim at the house where she was killed. Defendant contends that his crude remarks in the challenged portion of the interview prejudiced his case. But the challenged portion of the interview also added details that arguably bolstered his exculpatory claim of consensual sex. (See, *ante*, at pp. 1095–1096.)

### 3. *Instructions on consciousness of guilt*

Over defense objection, the trial court instructed the jury that it could infer consciousness of guilt from efforts to suppress evidence (CALJIC No. 2.06) and from the telling of a falsehood (CALJIC No. 2.03). Defendant contends that the trial court erred in giving these instructions because they are logically circular. He argues that for the jury to draw inferences of the consciousness of guilt permitted by these instructions, it would first have to resolve the ultimate question of whether defendant committed the charged crimes. He also contends that these instructions are argumentative pinpoint instructions that suggest to the jury an endorsement of the prosecutor's version of the case.

As defendant acknowledges, we have repeatedly rejected similar claims and upheld the propriety of these and similar consciousness of guilt instructions. Defendant's arguments do not persuade us to reconsider those decisions. (*People v. Jurado* (2006) 38 Cal.4th 72, 125 [41 Cal.Rptr.3d 319, 131 P.3d 400].)

### 4. *"Acquittal first" instruction*

Defendant contends that a special instruction on the alternative charge of being an accessory after the fact to murder was erroneous because it improperly limited the jury's order of deliberations for the charged offenses, thereby prejudicially affecting the jury's consideration of his defense to the murder charge, which was that he was not involved in the murder but merely helped the victim's husband dispose of her body.

Count 1 of the information alleged murder, and count 4 alleged that defendant was an accessory to murder. The trial court formulated this special

United States Supreme Court has reaffirmed its holding in *Davis* and extended it to ambiguous or equivocal invocations of the right to remain silent.

jury instruction concerning these alternative charges: "The defendant is accused in Count 1 of having committed the crime of murder and in Count 4 of having committed the crime of accessory after the fact of murder. The defendant cannot be convicted as both a principal and as an accessory to the same crime. [¶] In order to find the defendant guilty of the crime charged in Count 4, accessory after the fact to murder, you must first unanimously find the defendant not guilty of the crime charged in Count 1, murder of the first degree, and not guilty of the lesser offense of murder of the second degree. [¶] If you unanimously find the defendant guilty of murder of the first degree or the lesser offense of murder of the second degree, you should not render a verdict on Count 4, accessory after the fact of murder."

The trial court gave this special instruction immediately after CALJIC No. 8.75, which concerns the so-called "acquittal-first" rule for lesser-included offenses, which, in defendant's case, was second degree murder.[6] As the court explained to the parties during the discussion of jury instructions, count 4 (accessory after the fact) was an alternative charge to murder, not a lesser included offense. But the court noted that the jurors would have to apply the same type of "acquittal-first" concept and procedure to both the lesser included and alternative charges. Because the same concept applied to both, the trial court treated the special instruction concerning the alternative charge as a continuation of CALJIC No. 8.75.

---

[6] As given, CALJIC No. 8.75 read: "If you are not satisfied beyond a reasonable doubt that the defendant is guilty of the crime of first degree murder as charged in Count 1, and you unanimously so find, you may convict him of any lesser crime provided you are satisfied beyond a reasonable doubt that he is guilty of the lesser crime. [¶] You'll be provided with guilty and not guilty verdict forms as to Count 1 for the crime of murder in the first degree and lesser crimes thereto. Murder in the second degree is a lesser crime to that of murder in the first degree. Thus, you are to determine whether the defendant is guilty or not guilty of murder in the first degree or any lesser crime thereto. [¶] In doing so, you have discretion to choose the order in which you evaluate each crime and consider the evidence pertaining to it. You may find it to be productive to consider and reach tentative conclusions on all charged and lesser crimes before reaching any final verdicts. [¶] Before you return any final or formal verdicts, you must be guided by the following: [¶] Number one, if you unanimously find a defendant guilty of first degree murder as to count 1, your foreperson should sign and date the corresponding guilty verdict form; [¶] Number two, if you are unable to reach a unanimous verdict as to the charge in Count 1 of first degree murder, do not sign any verdict forms as to that count and report your disagreement to the court; [¶] Number three, the court cannot accept a verdict of guilty of second degree murder as to Count 1 unless the jury also unanimously finds and returns a signed verdict form of not guilty as to murder of the first degree in the same count; [¶] If you find the defendant—number 4, if you find the defendant not guilty of murder in the first degree as to Count 1, but cannot reach a unanimous agreement as to murder of the second degree, your foreperson should sign and date the not guilty of murder in the first degree form and should report your disagreement to the court; [¶] If—number five, if you unanimously find a defendant not guilty of first degree murder, but guilty of second degree murder, your foreperson should sign and date the corresponding verdict forms."

██ Under the acquittal-first rule, a trial court may direct the order in which jury verdicts are returned by requiring an express acquittal on the charged crime before a verdict may be returned on a lesser included offense. (*People v. Fields* (1996) 13 Cal.4th 289, 303–304 [52 Cal.Rptr.2d 282, 914 P.2d 832].) Although the jurors must record their *findings* on the verdict forms in this order, CALJIC No. 8.75 informs the jurors: "[Y]ou have discretion to choose the order in which you evaluate each crime and consider the evidence pertaining to it" and advises that it "may . . . be productive to consider and reach tentative conclusions *on all charged and lesser crimes* before reaching any final verdicts." (Italics added.) These advisements are designed to prevent the jury from applying a strict acquittal-first rule, under which the jury would have to acquit of the greater offense before even considering lesser included offenses. (See *People v. Kurtzman* (1988) 46 Cal.3d 322, 329–331 [250 Cal.Rptr. 244, 758 P.2d 572].) Here, CALJIC No. 8.75, as given, included these advisements. Defendant claims, however, that because the trial court did not repeat them in the special instruction dealing with the alternative charge, the special instruction was rendered ambiguous and possibly "misled the jurors to believe that they were not free to order their substantive deliberations the way they saw useful or proper."

██ There was no error in the trial court's special instruction. When reviewing an instructional ambiguity claim, we ask whether the jury was reasonably likely to have construed the instruction in a manner that violated the defendant's rights. (*People v. Whisenhunt* (2008) 44 Cal.4th 174, 214 [79 Cal.Rptr.3d 125, 186 P.3d 496].) Here, the trial court intentionally structured and read CALJIC No. 8.75 together with the special instruction on the alternative charge. Thus, it was not reasonably likely the jury would have failed to understand that it had the "discretion to choose the order of evaluation" for the alternative charge of accessory after the fact to murder.

### 5. *Accomplice testimony instruction*

Defense counsel requested a special instruction that was directed at the testimony of the murder victim's husband, Charlie Sammons, as a testifying accomplice and that quoted a concurring opinion to this court's decision in *People v. Guiuan* (1998) 18 Cal.4th 558 [76 Cal.Rptr.2d 239, 957 P.2d 928] (*Guiuan*). The trial court refused this special instruction and gave the standard cautionary instruction on accomplice testimony, CALJIC No. 3.18, which the court augmented with several sentences suggested in the special instruction. Defendant contends that the trial court erred in refusing to give the special instruction in its entirety.

The trial court found that, for the purposes of jury instructions, Charlie Sammons was an accomplice as a matter of law (because he was liable for

prosecution for the same crimes as defendant), and the court noted that it was therefore required to give a cautionary instruction about the testimony of an accomplice. The standard cautionary instruction on accomplice testimony, CALJIC No. 3.18 (6th ed. 1996) (1999 rev.), reflects the language of the majority opinion in *Guiuan, supra*, 18 Cal.4th at page 569, and states: "To the extent that an accomplice gives testimony that tends to incriminate the defendant, it should be viewed with caution. This does not mean, however, that you may arbitrarily disregard that testimony. You should give that testimony the weight you think it deserves after examining it with care and caution and in light of all the evidence in this case."

Defense counsel requested that the trial court instead give the cautionary instruction proposed in one of the concurring opinions to this court's decision in *Guiuan, supra*, 18 Cal.4th at page 576: " 'In deciding whether to believe testimony given by an accomplice, you should use greater care and caution than you do when deciding whether to believe testimony given by an ordinary witness. Because an accomplice is also subject to prosecution for the same offense, an accomplice's testimony may be strongly influenced by the hope or expectation that the prosecution will reward testimony that supports the prosecution's case by granting the accomplice immunity or leniency. For this reason, you should view with distrust accomplice testimony that supports the prosecution's case. Whether or not the accomplice testimony supports the prosecution's case, you should bear in mind the accomplice's interest in minimizing the seriousness of the crime and the significance of the accomplice's own role in its commission, the fact that the accomplice's participation in the crime may show the accomplice to be an untrustworthy person, and an accomplice's particular ability, because of inside knowledge about the details of the crime, to construct plausible falsehoods about it. In giving you this warning about accomplice testimony, I do not mean to suggest that you must or should disbelieve the accomplice testimony that you heard at this trial. Rather, you should give the accomplice testimony whatever weight you decide it deserves after considering all the evidence in the case.' " (*Ibid.* (conc. opn. of Kennard, J.).) As authority for this instruction, defense counsel quoted the concurring opinion's statement that "[a] cautionary instruction is more helpful and more effective if it states the reasons why special caution is warranted." (*Id.* at p. 571 (conc. opn. of Kennard, J.).)

The trial court declined to give the entire special instruction requested by defense counsel, but it did modify the standard instruction by adding two sentences, so that the instruction as given to the jury stated: "To the extent that Charlie Sammons gives testimony that tends to incriminate the defendant, it should be viewed with caution. *You should consider the extent to which his testimony may have been influenced by the receipt of or expectation of any benefits in return for his testimony. You should also consider anything that has a tendency in reason to prove or disprove the truthfulness of his*

*testimony, including but not limited to any interest he may have in the outcome of the defendant's trial.* This does not mean, however, that you may arbitrarily disregard that testimony. You should give that testimony the weight you think it deserves after examining it with care and caution and in light of all the evidence in this case."[7] (Italics added.)

Defendant acknowledges that CALJIC No. 3.18, which reflects the majority opinion in *Guiuan*, is a correct statement of the law. He argues, however, that otherwise correct statements of law may require amplification or explanation in uncommon situations, and that here the standard accomplice instruction required the amplification of his requested special instruction because Charlie Sammons testified as a "volunteering accomplice."

■ We have previously stated that, in appropriate situations, a trial court may be required to give a requested jury instruction that pinpoints a defense theory of the case, but the court need not give a pinpoint instruction that merely duplicates other instructions. (*People v. Whisenhunt, supra,* 44 Cal.4th 174, 220.) Here, defendant's proposed special instruction did not pinpoint a specific defense theory not covered by CALJIC No. 3.18, but merely provided a lengthier and more detailed expression of the law concerning accomplice testimony. Furthermore, the trial court's additions to CALJIC No. 3.18 adequately addressed defense counsel's concern that the instruction indicate the reasons the jury should view accomplice testimony with special caution. Because the instruction given was correct and adequate, the trial court did not err in refusing defendant's requested special instruction.

### 6. *Circumstantial evidence instruction*

The trial court instructed the jury under CALJIC Nos. 2.00 and 2.01, the standard instructions on circumstantial evidence.[8] Defendant contends that

---

[7] As this quotation reveals, the trial court substituted Charlie Sammons's name for the word "accomplice." The court did so to avoid suggesting to the jury that it should presume that defendant had committed the crime (namely, murder) to which Sammons would be considered an accomplice for the purposes of jury instructions. As defendant acknowledges, this use of the name was acceptable to all parties below, and on appeal defendant does not challenge this aspect of the jury instruction.

[8] "Circumstantial evidence is evidence that if found to be true proves a fact from which an inference of the existence of another fact may be drawn. [¶] An inference is a deduction of fact that may logically and reasonably be drawn from another fact or group of facts established by the evidence. [¶] It is not necessary that facts be proved by direct evidence. They may be proved also by circumstantial evidence or by a combination of direct evidence and circumstantial evidence. Both direct evidence and circumstantial evidence are acceptable as means of proof. Neither is entitled to any greater weight than the other. [¶] However, a finding of guilt as to any crime may not be based on circumstantial evidence unless the proved circumstances are not only consistent with the theory that the defendant is guilty of the crime, but cannot be reconciled with any other rational conclusion. [¶] Further, each fact which is essential to

the court erred in giving the instruction, and that the error was prejudicial because it may have caused the jury to reject as "unreasonable" defendant's version of events—that he had spontaneous consensual sex with the victim minutes after first meeting her—even though, as he further maintains, his version was supported by enough evidence to raise a reasonable doubt as to the prosecution's case.

Defendant acknowledges that in *People v. Wilson* (1992) 3 Cal.4th 926, 943 [13 Cal.Rptr.2d 259, 838 P.2d 1212], we rejected a claim that CALJIC No. 2.01 reduces the prosecutor's burden of proof. (See also *People v. D'Arcy* (2010) 48 Cal.4th 257, 295–296 [106 Cal.Rptr.3d 459, 226 P.3d 949].) Defendant seeks to distinguish this case from *Wilson*. Unlike in *Wilson*, where a circumstantial evidence instruction was required, he argues, here the necessary factual basis for instructing the jury under CALJIC No. 2.01 was lacking because the primary evidence against defendant was direct, not circumstantial. Because CALJIC No. 2.01 should *not* have been given, defendant contends, its language was particularly confusing to the jurors with respect to the prosecutor's burden of proof. As we conclude below, however, there was a sufficient factual basis to give CALJIC No. 2.01, and defendant's claim therefore fails.

"[W]e have consistently held that CALJIC No. 2.01 is not *necessary* unless the prosecution substantially relies on circumstantial evidence to prove its case." (*People v. Anderson* (2001) 25 Cal.4th 543, 582 [106 Cal.Rptr.2d 575, 22 P.3d 347], italics added.) This expression of the rule concerning CALJIC No. 2.01 was made in the context of assessing error in instances where CALJIC No. 2.01 was *not* given. Arguing that the same test applies to determine error where the instruction *was* given, defendant notes here that the most significant prosecution evidence in his case was the testimony of Charlie Sammons, the murder victim's husband, and defendant's admission to Detective Grate, neither of which is considered circumstantial evidence for the purposes of jury instruction. (See *People v. Gould* (1960) 54 Cal.2d 621, 629, 630 [7 Cal.Rptr. 273, 354 P.2d 865], overruled on other grounds in *People v. Cuevas* (1995) 12 Cal.4th 252, 257 [48 Cal.Rptr.2d 135, 906 P.2d 1290].) But the prosecution did present important circumstantial evidence,

complete a set of circumstances necessary to establish the defendant's guilt must be proved beyond a reasonable doubt. In other words, before an inference essential to establish guilt may be found to have been proved beyond a reasonable doubt, each fact or circumstance upon which such inference necessarily rests must be proved beyond a reasonable doubt. [¶] Also, if the circumstantial evidence is susceptible of two reasonable interpretations, one of which points to the defendant's guilt and the other to his innocence, you must adopt that interpretation which points to the defendant's innocence and reject that interpretation which points to his guilt. [¶] If on the other hand, one interpretation of such evidence appears to you to be reasonable and the other interpretation appears to you to be unreasonable, you must accept the reasonable interpretation and reject the unreasonable."

including that (1) the shape of the bruises on the victim's face and the shape of the tire iron found in defendant's apartment were circumstantial evidence that the tire iron was used to commit the murder, and (2) microabrasions in the victim's vagina and rectum were circumstantial evidence of the rape. (See, *ante*, at p. 1091.) Defendant acknowledges that the prosecution did present this circumstantial evidence, but he contends that it did not substantially rely upon that evidence. Rather, he argues, the evidence was "simply subordinate and corroborative" of the direct evidence of Charlie Sammons's testimony and defendant's admissions to Detective Grate.

We disagree. This physical evidence was a substantial part of the prosecution case and provided adequate justification for instructing the jury on the consideration of circumstantial evidence. Because we conclude that CALJIC No. 2.01 was properly given and we reaffirm its general validity under *People v. Wilson, supra,* 3 Cal.4th at page 943, we need not address defendant's further arguments that the instruction prejudiced his case.

### 7. *Cumulative prejudice from guilt phase errors*

Defendant contends that the cumulative effect of the asserted guilt phase errors requires reversal of his conviction, even if none of the errors was prejudicial individually. Because we conclude there were no errors at the guilt phase, we reject defendant's claim that any cumulative effect warrants reversal.

### 8. *Lack of verdict on being an accessory to murder charge*

As already stated (see, *ante*, at p. 1109), defendant was charged with murder in count 1, and with being an accessory to murder in count 4. The trial court instructed the jury that "defendant cannot be convicted as both a principal and as an accessory to the same crime." The verdict forms told the jury to return a verdict on count 4 only if it found defendant not guilty of both murder of the first degree and murder of the second degree in count 1. The jury found defendant guilty in count 1 of murder of the first degree. The jury left the verdict form for count 4 blank.

Defendant contends that because he could not be convicted both of murder and being an accessory after the fact to the same murder, if we affirm his conviction for first degree murder we should also order "an express acquittal on Count 4." We do affirm his conviction for first degree murder, but we decline to order an express acquittal on count 4. Defendant cites no authority indicating whether or how an appellate court could issue such an order of acquittal. Moreover, defendant fails to show how he is prejudiced by the lack of such an acquittal. Defendant was *not* convicted of count 4. The jury

correctly followed its instructions and did not respond to count 4, precisely because it found defendant guilty of count 1.[9]

### 9. *Sufficiency of evidence for prior-murder special circumstance*

As noted earlier (see, *ante*, at p. 1098), defendant waived his right to a jury trial on the prior-murder special-circumstance allegation, which had been bifurcated from the guilt phase trial in this case, and he submitted the allegation to a trial by the court. Based on documentary evidence of defendant's convictions for robbery and for second degree murder in Arizona in 1983, the court found the allegation true. In particular, the court ruled that defendant's Arizona murder conviction supported the prior-murder special-circumstance allegation because, under section 190.2, subdivision (a)(2), his Arizona offense would have been punishable as first or second degree murder in California. Defendant contends this ruling was erroneous because the elements of second degree murder are different in Arizona and California. As we explain, defendant's Arizona offense would have been punishable as first degree murder in California, and therefore defendant's Arizona murder conviction properly supported the prior-murder special-circumstance allegation.

Defendant filed a pretrial motion to strike his Arizona prior convictions on the grounds that his counsel rendered ineffective assistance and that his plea was not voluntarily entered. In support of that motion, defense counsel attached as exhibits hundreds of pages of documents from the Arizona proceeding, including indictments, grand jury transcripts, defendant's plea agreement, and transcripts of defendant's guilty plea and sentencing hearing. The trial court denied the motion to strike, a ruling that defendant does not challenge on this appeal.

The prior-murder special-circumstance allegation, which was based on the Arizona murder conviction, was bifurcated from the guilt phase of the trial in this case. (See § 190.1, subds. (a), (b).) Defendant waived his right to a jury trial and submitted the matter to a court trial. The prosecutor submitted documentary evidence, including a certified copy of defendant's Arizona convictions and copies of the relevant Arizona criminal statutes. The prosecutor also asked the court to take judicial notice of certain exhibits to defendant's pretrial motion to strike the prior convictions, including copies of the Arizona plea agreement, court minutes of the entry of the plea and sentencing, and a transcript of the plea proceeding.

---

[9] We note that under certain factual circumstances, a defendant can be convicted as both a principal and an accessory to the same crime. (*People v. Jennings* (2010) 50 Cal.4th 616, 668 [114 Cal.Rptr.3d 133, 237 P.3d 474].) We need not and do not reach the issue of whether that was the case here.

In the Arizona plea proceeding, defense counsel and the prosecutor had agreed that the grand jury transcript provided a factual basis for the plea, and the trial court had both the prosecutor and defense counsel summarize the contents of those transcripts. The facts recounted in the plea proceeding, which defendant acknowledges in his own briefing, are that defendant, who was hitchhiking with his dog, met victim John Noble, also a hitchhiker, and they drank alcohol together by the side of a highway in Arizona. Noble said he was going to try to get a job in Phoenix, Arizona, mentioned certain information about the job, then went to sleep. To obtain the job information, defendant decided to take Noble's wallet. As he was doing so, Noble awoke and a struggle ensued in which defendant fought to keep the wallet, to stop Noble from kicking the dog, to punish Noble for kicking the dog, or some combination of all three purposes. An artery in Noble's neck was severed and Noble bled to death.

 Section 190.2, subdivision (a)(2), states that, for the purpose of defining a prior-murder special circumstance, "an offense committed in another jurisdiction . . . shall be deemed murder in the first or second degree" if the offense "if committed in California would be punishable as first or second degree murder." Pointing to the elements of Arizona second degree murder, defendant contends that its "least adjudicated form" includes knowingly causing serious physical injury that leads to the death of a person.[10] Defendant contends this conduct falls short of the requirements of implied malice (second degree) murder in California, which is " ' "an intentional act, the natural consequences of which are dangerous to life," ' " and which " ' "was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life." ' " (*People v. Martinez* (2003) 31 Cal.4th 673, 684 [3 Cal.Rptr.3d 648, 74 P.3d 748].)

We need not resolve, however, whether the elements of the least adjudicated form of Arizona second degree murder constitute implied malice murder in California. As we conclude below, because defendant pleaded guilty in the Arizona case not only to murder but to robbing the murder

---

[10] Arizona Revised Statutes section 13-1104, defines three forms of second degree murder: "A person commits second degree murder if without premeditation: [¶] 1. The person intentionally causes the death of another person . . . ; or [¶] 2. *Knowing that the person's conduct will cause death or serious physical injury, the person causes the death of another person* . . . ; or [¶] 3. Under circumstances manifesting extreme indifference to human life, the person recklessly engages in conduct that creates a grave risk of death and thereby causes the death of another person . . . ." (Italics added.) Arizona Revised Statutes section 13-105, subdivision 38 defines " '[s]erious physical injury' " as "includ[ing] physical injury that creates a reasonable risk of death, or that causes serious and permanent disfigurement, serious impairment of health or loss or protracted impairment of the function of any bodily organ or limb."

victim, and because the undisputed facts demonstrate that the robbery and the killing occurred during a continuous transaction, his Arizona murder would be punishable in California as first degree murder under the felony-murder rule. (*People v. Cavitt* (2004) 33 Cal.4th 187, 206–207 [14 Cal.Rptr.3d 281, 91 P.3d 222]; §§ 187, 189.)

■ As defendant acknowledges, under California and Arizona law all of the elements of robbery are the same, including the intent to deprive permanently. In California, robbery is defined as "the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." (§ 211.) Theft and robbery have the same felonious taking element, which is the intent to steal, or to feloniously deprive the owner permanently of his or her property. (*People v. Montoya* (2004) 33 Cal.4th 1031, 1037 [16 Cal.Rptr.3d 902, 94 P.3d 1098].) We have held that the intent to deprive permanently is satisfied by the intent to deprive temporarily but for an unreasonable time so as to deprive the person of a major portion of the value or enjoyment. (*People v. Avery* (2002) 27 Cal.4th 49, 58 [115 Cal.Rptr.2d 403, 38 P.3d 1].) In Arizona, robbery is defined as follows: "A person commits robbery if in the course of taking any property of another from his person or immediate presence and against his will, such person threatens or uses force against any person with intent either to coerce surrender of property or to prevent resistance to such person taking or retaining property." (Ariz. Rev. Stat. § 13-1902A.) In Arizona, as in California, the felonious taking element of robbery includes the "intent to deprive" a person of his or her property, which is stated in the Arizona definition of theft. (*State v. Celaya* (1983) 135 Ariz. 248 [660 P.2d 849, 852–853], quoting Ariz. Rev. Stat. § 13-1802A.1.) In Arizona, as in California, intent to deprive means "to withhold the property interest of another either permanently or for so long a time period that a substantial portion of its economic value or usefulness or enjoyment is lost . . . ." (*Matter of Appeal in Maricopa County Juvenile Action* (Ct.App. 1984) 141 Ariz. 404 [687 P.2d 412, 414].) The elements of California robbery for California felony murder are thus established by defendant's guilty plea to the charge of Arizona robbery contained in defendant's indictment.

■ In considering a foreign murder conviction under section 190.2, subdivision (a)(2), we analyze both the elements of the crime of murder under which the defendant was charged and the facts shown in defendant's indictment. (*People v. Martinez, supra*, 31 Cal.4th at p. 688.) Both the grand jury indictment and defendant's plea agreement indicate that defendant robbed and killed the victim, John Noble, on the same day. These facts from the indictment provide the necessary conditions for California felony murder but are not sufficient to establish it. What must be further established is that defendant robbed and killed victim Noble during the course of a continuous transaction. (See *People v. Cavitt, supra*, 33 Cal.4th at pp. 206–207; cf.

*People v. Ford* (1966) 65 Cal.2d 41, 55–57 [52 Cal.Rptr. 228, 416 P.2d 132] [felony-murder rule not applicable when the defendant, after committing a robbery, drove aimlessly around and many hours later shot a police officer], overruled on other grounds in *People v. Satchell* (1971) 6 Cal.3d 28, 35–41 [98 Cal.Rptr. 33, 489 P.2d 1361].) In order to establish that a continuous transaction occurred here, we need to consider the circumstances of the crime in the record beyond the mere facts contained in the indictment. Defendant contends, however, that we must make our analysis solely on the basis of the general *elements* of the theory of murder in question, and that we cannot consider any references to the specific *facts* and *circumstances* of the offense beyond those indicated in the indictment. Whether we may properly consider such further facts and circumstances in our analysis of a foreign murder conviction under section 190.2, subdivision (a)(2), is a question we have previously left open. (*People v. Martinez, supra*, 31 Cal.4th at p. 688.) We now conclude that we may properly consider at least the *uncontested* facts and circumstances of the offense in the record, which here establish that the robbery and killing occurred during the course of a continuous transaction, and which therefore establish that this crime "would be punishable" as first degree felony murder in California.[11] (§ 190.2, subd. (a)(2).)

■ Defendant objects to our concluding that his Arizona prior murder would be felony murder under California law because, he contends, the description of his crimes at his plea hearing shows the robbery was incidental to or an afterthought to the homicide. (See, e.g., *People v. Prince* (2007) 40 Cal.4th 1179, 1259 [57 Cal.Rptr.3d 543, 156 P.3d 1015] [for purposes of the felony-murder rule, the homicide " 'need not occur in the midst of the commission of the felony, so long as that felony is not merely incidental to, or an afterthought to, the killing' "].) The record does not support defendant's objection. Rather, as the transcript of the hearing at which defendant entered his guilty plea establishes and defendant's own briefing concedes: (1) defendant decided to take Noble's wallet while Noble was sleeping; (2) Noble woke up and a fight ensued; (3) Noble was killed in the fight or died shortly thereafter as a result of it; and (4) defendant acquired Noble's wallet, later producing it for the police after his arrest. On these facts, the robbery of Noble was not " 'merely incidental to, or an afterthought to, [his] killing.' " (*Ibid.*)

---

[11] This conclusion is consistent with the approach taken in determining whether foreign convictions qualify as prior serious felonies under the California "Three Strikes" law or other enhancements based on prior convictions: "If the enumeration of the elements of the offense does not resolve the issue, an examination of the record of the earlier criminal proceeding is required in order to ascertain whether that record reveals whether the conviction realistically may have been based on conduct that would not constitute a serious felony under California law." (*People v. McGee* (2006) 38 Cal.4th 682, 706 [42 Cal.Rptr.3d 899, 133 P.3d 1054].) We do not reach the issue of whether or how the contested circumstances of a foreign conviction should be considered under section 190.2, subdivision (a)(2).

B. *Penalty Phase Issues*

1. *Absence of factor (b) instruction for prior murder*

As stated earlier (see, *ante,* at pp. 1098–1099), at defendant's penalty phase trial the prosecutor introduced evidence of two aggravating circumstances: (1) defendant's prior convictions for murder and robbery in Arizona, and (2) defendant's possession of a gun while on parole. As to defendant's prior convictions for murder and robbery, the trial court instructed the jury under section 190.3, factor (c) (factor (c)) (prior felony conviction) that, before it could consider these convictions as an aggravating circumstance, it must first be satisfied beyond a reasonable doubt that defendant had in fact been convicted of those crimes. As to defendant's possession of a firearm while on parole, the trial court instructed the jury under section 190.3, factor (b) (factor (b)) (prior criminal act involving the threat of force or violence) that before it could consider this prior conduct as an aggravating circumstance, it must first be satisfied beyond a reasonable doubt that defendant had in fact committed the criminal act.

Defendant contends that the trial court erred in its instructions concerning defendant's Arizona prior murder conviction because the prosecutor used that conviction not only as evidence of a prior felony conviction under factor (c), but also as evidence of other violent criminal activity under factor (b). Therefore, defendant contends, the trial court should have additionally instructed the jury that before it could consider his prior murder conviction under factor (b), it had to be satisfied beyond a reasonable doubt that he had in fact committed the violent *conduct* underlying that conviction (as distinct from the *fact* of his conviction). Defendant further contends that a special instruction the trial court gave concerning his Arizona prior convictions exacerbated this alleged instructional error. As we conclude below, however, the trial court's instructions were correct. Furthermore, even if we assume for the sake of argument that there was instructional error, we discern no prejudice.

The trial court's penalty phase instructions on the aggravating circumstances reflected accommodations to requests by both the defense and the prosecution. In connection with the trial court's instruction on defendant's Arizona convictions as factor (c) prior felony convictions, defense counsel had asked the trial court to instruct the jury on the elements of robbery and second degree murder under Arizona law. The prosecutor objected, stating that the proposed instruction might mislead the jury into concluding that it had to retry defendant for these Arizona prior crimes. The trial court then said it would instruct the jury on the elements and definitions of second degree murder and robbery under Arizona law, but added that it would make clear to the jury that

it was not to determine whether or not defendant was factually guilty of those crimes. The court further stated it would instruct the jury that it could consider the facts and circumstances underlying the Arizona convictions in determining what weight to give them as an aggravating circumstance.

The trial court instructed the jury on the Arizona prior convictions as follows: "Evidence has been introduced for the purpose of showing that the defendant, Robert Allen Bacon, has been convicted of the crimes of murder in the second degree and robbery prior to the offense of murder in the first degree of which he's been found guilty in this case. [¶] Before you may consider any of the alleged crimes as an aggravating circumstance in this case, you must first be satisfied beyond a reasonable doubt that the defendant, Robert Allen Bacon, was in fact convicted of the prior crimes. [¶] It is alleged as an aggravating circumstance that on or about August 17, 1983, the defendant suffered a felony conviction in the state of Arizona for a violation of Arizona Revised Statutes Section 13-1104, second degree murder . . . [and] for a violation of Arizona Revised Statutes Section 13-1902, robbery . . . . [¶] You have been instructed on the elements of the crimes of second degree murder and robbery under Arizona law. The sole purpose of these instructions is to provide you with a better understanding of the conduct which constitutes those crimes in Arizona. [¶] While you must first be satisfied beyond a reasonable doubt that the defendant was, in fact, convicted of those prior crimes before you may consider them as an aggravating circumstance, the People need only prove in these proceedings that the defendant was convicted of those crimes. However, to the extent evidence was introduced concerning the commission of those crimes, you may consider that evidence in determining the weight to which you believe such circumstance is entitled."

The court then gave this instruction as to defendant's possession of a firearm while on parole: "Evidence has been introduced for the purpose of showing that the defendant, Robert A. Bacon, has committed the following criminal act, possession of a firearm, which involved the threat of force or violence. Before a juror may consider any criminal act as an aggravating circumstance in this case, a juror must first be satisfied beyond a reasonable doubt that the defendant, Robert A. Bacon, did in fact commit the criminal act. A juror may not consider any evidence of any other criminal act as an aggravating circumstance. [¶] It is not necessary for all jurors to agree. If any juror is convinced beyond a reasonable doubt that the criminal act occurred, that juror may consider that act as a fact in aggravation. If the juror is not so convinced, that juror must not consider that evidence for any purpose."

Thereafter, in their closing arguments to the jury, both the prosecutor and defense counsel discussed the Arizona murder. After concisely reviewing the testimony of one of the investigating officers who had testified, the prosecutor

argued: "Mr. Bacon is unable to see the world through anyone's eyes other than Mr. Bacon's and so he felt justified in beating and taking a broken beer bottle to the throat of some man because 'he hit my dog.'" Later in his argument, the prosecutor contrasted defendant's murder of Deborah Sammons with the Arizona murder, stating that her murder "was not a spur of the moment killing" like "the killing in Arizona," which "was done without premeditation." The prosecutor argued that defendant had not learned anything from having spent 11 years in prison for the Arizona murder, and that, not only did defendant kill again, "he plotted and planned and premeditatedly killed someone again."

In his closing argument to the jury, defense counsel argued that the Arizona prior killing was not premeditated, referring to the part of the definition of premeditation under Arizona law specifying that "an act is not done with premeditation if it is the instant effect of a sudden quarrel or heat of passion." He argued that the killing was the result of a fight that started when the victim kicked defendant's dog. He characterized the fight as a "drunken brawl" "involving two transients on a rural highway in the middle of Arizona, one with a .18 blood/alcohol." He acknowledged that "it appears . . . that a beer bottle was . . . involved," but he argued there was no evidence that defendant "somehow held that bottle and wielded it in some vicious fashion."

Defendant's argument for prejudicial error in the trial court's jury instructions on factors (b) and (c) is based on these assertions: (1) The Arizona prior murder conviction was used by the prosecutor not only as factor (c) evidence pertaining to recidivism, but as factor (b) evidence pertaining to defendant's propensity for violence; (2) the trial court's instructions referenced the Arizona murder only in the instructions for factor (c), improperly omitting it from the instructions for factor (b); and (3) the trial court's special instruction on the Arizona murder conviction led the jury to believe that finding beyond a reasonable doubt the *fact* of the Arizona prior murder conviction (as factor (c) evidence) was also sufficient to allow it to consider the violent *conduct* underlying the conviction (as factor (b) evidence), thereby relieving the jury of having to first determine beyond a reasonable doubt whether that prior violent conduct had in fact happened. Defendant contends that the cumulative effect of the asserted instructional errors prejudiced him because "it buffered the jurors from considering specifically and carefully the actual level of moral aggravation imported by appellant's *acts* underlying the conviction itself."

The Attorney General disputes the first of these assertions, arguing that the prosecutor's references to the facts and circumstances underlying the Arizona murder were used, not to show defendant's propensity for violence under factor (b), but rather to show the absence of the mitigating factor of remorse. We disagree. The closing arguments of both the prosecution and the defense

described the conduct underlying the Arizona murder, and both therefore raised in some fashion the issue of violence. As recounted above, the prosecutor also raised the factor (c) issue of recidivism by arguing that defendant had learned nothing from his 11 years in prison for the Arizona murder. But we cannot conclude, as respondent urges, that nothing in the prosecutor's remarks implicated factor (b).[12]

 As to defendant's second assertion—that the trial court's instructions mentioned the Arizona murder only in relation to factor (c), and not factor (b)—we agree that the trial court did not list defendant's prior convictions in Arizona in the portion of the instructions pertaining to factor (b) evidence. In its factor (b) instruction, the trial court specified only defendant's gun possession while on parole. A trial court is under no obligation, however, to specify for the jury the violent criminal activity that may be considered. (*People v. Lewis* (2001) 25 Cal.4th 610, 666 [106 Cal.Rptr.2d 629, 22 P.3d 392].) It is incumbent on defense counsel to point out an omitted incident and request a more complete instruction on the subject. (*Ibid.*) Defendant therefore has forfeited this contention.

 As to defendant's third assertion—that under the trial court's special instruction on the Arizona prior murder conviction, a finding that defendant had suffered that conviction would also permit the jury to consider the violent *conduct* underlying the conviction without first determining beyond a reasonable doubt whether that violent conduct had in fact happened—the court's special instruction on the Arizona prior convictions certainly allowed the jury to consider evidence "introduced concerning the commission of those crimes." Indeed, most of the prosecution's evidence at the penalty phase pertained to the conduct underlying the Arizona prior murder conviction, not merely the fact of the conviction itself. Thus defendant's claim turns on whether the trial court had a duty to instruct the jury that, before it could consider the conduct underlying defendant's Arizona murder conviction in aggravation under factor (b), it had to find beyond a reasonable doubt that the conduct had in fact occurred. We have previously rejected such an argument. (*People v. Ashmus* (1991) 54 Cal.3d 932, 1000–1001 [2 Cal.Rptr.2d 112, 820 P.2d 214] (*Ashmus*), disapproved on other grounds in *People v. Yeoman* (2003) 31 Cal.4th 93, 117 [2 Cal.Rptr.3d 186, 72 P.3d 1166].) In *Ashmus*, the trial court instructed the jury that it had to find beyond a reasonable doubt the fact of defendant's conviction of the felony of assault with intent to commit rape, but it did not instruct the jury that additionally it had to find beyond a

---

[12] To be clear, defendant does not argue that the jury should not have been allowed to consider his Arizona murder under both factors (b) and (c). As we have held, and as defendant acknowledges, a prior felony conviction involving violence or threat of violence can be considered for its relevance under both factor (b) and factor (c). (*People v. Melton* (1988) 44 Cal.3d 713, 764 [244 Cal.Rptr. 867, 750 P.2d 741].)

reasonable doubt the conduct underlying the conviction. (*Ashmus, supra*, at p. 1000.) A reasonable-doubt instruction as to the underlying conduct is not necessary, we held, when the defendant has already been convicted of the crime in question. (*Ibid.*) We explained that a reasonable-doubt instruction is required for *unadjudicated* violent criminal acts because the lack of a conviction raises reliability concerns, implying that these concerns are not present with respect to incidents for which there was a prior conviction. (*Ibid.*)

*Ashmus* left open the question of "whether a reasonable-doubt instruction remains necessary when the People seek to prove conduct underlying the conviction other than the facts necessarily established." (*Ashmus, supra*, 54 Cal.3d at p. 1001, fn. 25.) In dicta, *Ashmus* answered the question in the affirmative, citing *People v. Kaurish* (1990) 52 Cal.3d 648, 707 [276 Cal.Rptr. 788, 802 P.2d 278] (*Kaurish*), and *People v. Morales* (1989) 48 Cal.3d 527, 566 [257 Cal.Rptr. 64, 770 P.2d 244] (*Morales*), disapproved on another ground in *People v. Williams* (2010) 49 Cal.4th 405, 459 [111 Cal.Rptr.3d 589, 233 P.3d 1000].[13] In *Kaurish*, the prosecution introduced evidence of the defendant's prior conviction for armed robbery, which included testimony that the defendant had choked the store's proprietor during the robbery. (*Kaurish, supra*, 52 Cal.3d at p. 707.) We held that the choking incident constituted separate violent criminal activity under factor (b) that required a reasonable-doubt instruction in addition to the reasonable-doubt instruction given as to the prior conviction for armed robbery under factor (c). (*Kaurish, supra*, at p. 707.) In *Morales*, similarly, the People introduced evidence that during a robbery, for which the defendant was convicted, the defendant committed a separate assault for which he was not charged. (*Morales, supra*, 48 Cal.3d at pp. 565–566.) We stated that a reasonable-doubt instruction for the conduct "should be given where the penalty phase evidence discloses a crime in addition to the one of which the defendant was convicted." (*Id.* at p. 566.)

In *Kaurish* and *Morales*, the assaultive conduct described went beyond the elements of the crime of robbery for which those defendants had been convicted, and therefore it was a separate unadjudicated criminal act for which a separate reasonable-doubt instruction under factor (b) was required. In contrast, in this case, the conduct the prosecutor described was *not* "violent criminal activity that did not result in a conviction" (*Kaurish, supra*, 52 Cal.3d

---

[13] In *People v. Williams, supra*, 49 Cal.4th 405, 459, we held that a reasonable-doubt instruction is always required for factor (c) evidence, disapproving some prior decisions that were inconsistent on that point, including *People v. Morales, supra*, 48 Cal.3d 527. *Williams* is not implicated here because a reasonable-doubt instruction *was* given for the factor (c) evidence. As discussed above, defendant's contention is that an *additional* reasonable-doubt instruction should have been given for the factor (b) use of factor (c) evidence, an issue we did not reach in *Williams*.

at p. 707) or "a crime in addition to the one of which the defendant was convicted." (*Morales, supra,* 48 Cal.3d at p. 566.) Rather, the conduct described was precisely the basis for defendant's Arizona prior conviction for second degree murder. As recounted above, defense counsel disputed to some degree the prosecutor's description of defendant's conduct, specifically whether defendant intentionally used the broken bottle as a weapon to slit the victim's throat. The disputed conduct, however, was part of the conduct that formed the basis of the crime of which defendant was convicted, not some other crime with which he could have been charged but was not. The trial court therefore was not required to give an additional reasonable-doubt instruction concerning this conduct as factor (b) evidence.

Finally, even if we assume for the sake of argument that the trial court should have given an additional reasonable-doubt instruction about the conduct underlying the Arizona prior murder conviction, we see no prejudice under the facts here. "[T]he absence of the instruction is not prejudicial when the evidence of defendant's commission of a violent crime is uncontroverted." (*People v. Pinholster* (1992) 1 Cal.4th 865, 965 [4 Cal.Rptr.2d 765, 824 P.2d 571], disapproved on another ground in *People v. Williams, supra,* 49 Cal.4th at p. 459.) As mentioned earlier, although the prosecutor and defense counsel used contrasting *moral* frameworks to discuss the Arizona murder in their closing arguments, they substantially agreed on the facts of the conduct. The prosecutor and defense counsel both characterized the Arizona murder as a spur-of-the-moment killing that was done without premeditation. Defense counsel acknowledged that defendant's killing of Noble in Arizona was a violent crime and that a beer bottle was involved in the crime. The factual dispute was whether defendant intentionally used the beer bottle as a weapon, or whether, as defense counsel suggested, the cutting was somehow accidental. Although this factual dispute was not insignificant to the weight of aggravation a jury might assess for the Arizona prior murder, its significance is slight when viewed in light of the considerably more brutal manner in which defendant murdered Deborah Sammons by stab wounds to the face and chest, blunt force injuries, and strangulation, all of which were clearly intentional acts. Thus there was no reasonable possibility that, had the jury been instructed regarding factor (b) with respect to the Arizona prior murder, it would have accorded it less weight, much less a possibility that the additional instruction would have influenced the outcome of the penalty phase. (See *Kaurish, supra,* 52 Cal.3d at p. 708.)

> 2. *Defense counsel's proposed instruction on Arizona voluntary manslaughter*

The trial court refused defense counsel's request for a special instruction on the elements of manslaughter under Arizona law. Defendant contends the

refusal was erroneous because the proposed instruction was a vital part of his defense at the penalty phase. As we explain below, the trial court did not err in refusing the proposed instruction.

As noted (see, *ante*, at pp. 1119–1120), defense counsel requested and received a jury instruction on the elements of Arizona second degree murder. Defense counsel also asked the court to instruct on the definition of voluntary manslaughter under Arizona law.[14] The prosecutor objected that the only reason to instruct on manslaughter would be to try to convince the jury that defendant should have been convicted of manslaughter rather than murder, which, the prosecutor argued, was not the jury's task in the penalty phase. The trial court agreed with the prosecutor and refused the instruction, stating that "no purpose would be served by instructing the jury on what manslaughter is in Arizona. It's not relevant and would confuse the jurors as to their task with respect to the prior felony convictions."

■ Upon request by the defense or prosecution, a trial court must instruct on the elements of an unadjudicated crime offered under factor (b) or the elements of the offense underlying a conviction offered under factor (c). (*People v. Adcox* (1988) 47 Cal.3d 207, 256 [253 Cal.Rptr. 55, 763 P.2d 906]; *People v. Cain* (1995) 10 Cal.4th 1, 72 [40 Cal.Rptr.2d 481, 892 P.2d 1224].) Defendant presents no authority, nor are we aware of any, that the trial court is ever obligated to instruct on lesser offenses if requested by trial counsel at the penalty phase. (*People v. Butler* (2009) 46 Cal.4th 847, 867–868 [95 Cal.Rptr.3d 376, 209 P.3d 596].) Defendant contends, however, that because this requested instruction was vital to his penalty phase defense, the trial court had no discretion to refuse to give it.

■ In *People v. Cain, supra*, 10 Cal.4th 1, 72–73, we considered whether a trial court at the penalty phase had a duty to instruct, on its own motion, on a defense to a crime presented under factor (b). The factor (b) evidence there involved an assault, and the defendant argued that the trial court had a duty to instruct on the defense of others as a legal defense to assault. (*Cain, supra*, at p. 72.) In rejecting the claim, we concluded that, on the facts presented, even without an instruction on the legal defense to assault "the jury had before it evidence and argument from which it could rationally assess the degree of culpability [the] defendant bore in the prior incident."

---

[14] The proposed instruction stated: "In the State of Arizona, manslaughter is a lesser crime to second degree murder. Pursuant to Arizona Revised Statutes Section 13-1103(a), a person commits manslaughter by: [¶] (1) Recklessly causing the death of another person; or [¶] (2) Committing second-degree murder as defined in Section 13-1104, subsection A, upon a sudden quarrel or heat of passion resulting from adequate provocation by the victim. [¶] Adequate provocation is defined in Arizona Revised Statutes Section 13-1104(4) as follows: [¶] 'Adequate provocation' means conduct or circumstances sufficient to deprive a reasonable person of self-control."

(*Id.* at p. 73.) We further observed that "[t]he proper focus for consideration of prior violent crimes in the penalty phase is on the facts of the defendant's past actions as they reflect on his character, rather than on the labels to be assigned the past crimes . . . ." (*Ibid.*)

Although this case involves the trial court's refusal of a requested instruction rather than the possible existence of a duty to instruct on the court's own motion, the same reasoning applies here. As discussed earlier, defense counsel argued to the jury that the Arizona killing was the result of a sudden quarrel or heat of passion provoked by the victim's kicking defendant's dog. Defense counsel thereby presented to the jury a manslaughter-type argument in mitigation. As in *People v. Cain, supra*, 10 Cal.4th at page 73, the jury had before it the evidence and the argument from which it could rationally assess defendant's degree of culpability for the Arizona prior murder. The legal label, "manslaughter," was not vital to this argument. It was therefore within the trial court's discretion to refuse defendant's manslaughter instruction and, because the instruction could have confused the jurors as to their task in the penalty phase, the court's refusal was not an abuse of discretion.

### 3. *Admission of handgun possession evidence under factor (b)*

As recounted (see, *ante*, at p. 1099), at the penalty phase the prosecution presented evidence that defendant's parole officer had found a loaded gun under defendant's pillow during a parole search of his dwelling. Defendant contends that possession of a gun while under parole supervision is not criminal activity that involves "the express or implicit threat to use force or violence," and that the trial court therefore erred in admitting the evidence under factor (b). As we explain below, the trial court did not abuse its discretion in admitting this evidence.

 During the penalty phase, the prosecution sought to introduce in aggravation, under factor (b), evidence of defendant's possession of a handgun while on parole in Arizona. The court denied defendant's motion to exclude the evidence, stating: "[L]ooking at the circumstances of the discovery of that weapon, I would conclude that the location of the weapon, which would render it readily available for use by a person lying on the bed where apparently it was found, coupled with the defendant's quasi-custodial status as a parolee at the time and the potential consequences of him being found in possession of that firearm, leads me to the conclusion that the possession of the weapon involved the implied threat of force or violence at the time. And therefore, it is admissible pursuant to Penal Code section 190.3 [factor] (b)."

 "Factor (b) of section 190.3 permits the introduction of evidence of '[t]he presence or absence of criminal activity by the defendant which

involved the use or attempted use of force or violence or the express or implied threat to use force or violence.'" (*People v. Michaels* (2002) 28 Cal.4th 486, 535 [122 Cal.Rptr.2d 285, 49 P.3d 1032].) A trial court's decision to admit, at the penalty phase, evidence of a defendant's prior criminal activity is reviewed under the abuse of discretion standard. (*People v. Smithey* (1999) 20 Cal.4th 936, 991 [86 Cal.Rptr.2d 243, 978 P.2d 1171].) Possession of a firearm is not, in every circumstance, an act committed with actual or implied force or violence. (*People v. Jackson* (1996) 13 Cal.4th 1164, 1235 [56 Cal.Rptr.2d 49, 920 P.2d 1254].) The factual circumstances surrounding the possession, however, may indicate an implied threat of violence. (*Id.* at pp. 1235–1236.) "In a series of cases . . . [citations], we have held that the possession of a weapon in a custodial setting—where possession of any weapon is illegal—'involve[s] an implied threat of violence even when there is no evidence defendant used or displayed it in a provocative or threatening manner.'" (*People v. Michaels, supra*, 28 Cal.4th at p. 535.) "Even in a *noncustodial* setting, illegal possession of potentially dangerous weapons may 'show[] an implied intention to put the weapons to unlawful use,' rendering the evidence admissible pursuant to section 190.3 factor (b)." (*People v. Dykes* (2009) 46 Cal.4th 731, 777 [95 Cal.Rptr.3d 78, 209 P.3d 1].)

Defendant acknowledges that being under parole supervision is constructive custody, but contends that constructive custody is not identical for all legal purposes to actual custody, and that his case is therefore distinguishable from the cases reviewed in *People v. Michaels, supra*, 28 Cal.4th 486, 535, involving possession of a weapon in prison under factor (b). Defendant contends there must be some other "extraordinary circumstance," such as the nature or number of the weapons possessed, to qualify the possession of a firearm by a parolee as factor (b) evidence. Defendant argues that "the nature of the weapon itself, a simple handgun, did not suggest implied violence."

The question of factor (b) admissibility does not turn on whether constructive custody is identical for all legal purposes to actual custody. Rather, the question here is whether the trial court abused its discretion in ruling that the circumstances of defendant's gun possession while under constructive custody involved a threat of violence under factor (b). We see no abuse of discretion. The criminal character of defendant's possession of a loaded firearm, at a time when he was subject to parole searches in Arizona, is sufficient to permit a jury to view his possession as an implied threat of violence. (See *People v. Michaels, supra*, 28 Cal.4th at p. 536.) We reject defendant's contention that some additional extraordinary circumstance was required. Defense counsel was free to argue to the jury (and indeed did argue) that defendant possessed the gun for the purpose of self-protection, not for criminal violence. (See *ibid.*) The trial court did not err in admitting the evidence.

### 4. *Penalty phase prejudice from failure to suppress defendant's statements*

As recounted (see, *ante*, at pp. 1104–1105), during the guilt phase defendant challenged the admissibility of a portion of his interview with Detective Grate as being in violation of *Miranda, supra*, 384 U.S. 436. Defendant contends that the admission of his statements to Detective Grate prejudiced him at the penalty phase. Specifically, he complains that the prosecution cited the statements during closing argument as showing he lacked compassion because, when asked to describe the condition of the victim's body immediately after the murder, defendant answered, "I didn't want to fuck her." Defendant argues that, if we conclude that his statements were admitted in violation of *Miranda*, we should find prejudice from the prosecutor's use of the statements at the penalty phase. Because, as we have explained, defendant's statements were not admitted in violation of *Miranda,* this claim fails.

### 5. *Penalty phase prejudice from guilt phase exclusion of defense evidence*

As explained (see, *ante*, at pp. 1101–1102), defendant challenged, at the guilt phase of his capital trial, the court's exclusion of a note in defendant's handwriting containing the victim's name, her work address, and an unidentified phone number. Defendant argues that if we concluded the trial court erred in excluding the note, then we should conclude that the exclusion of the note prejudiced defendant at the penalty phase. Defendant contends that the exclusion of the note harmed him at the penalty phase because, had the note been admitted, it would have strengthened defendant's appeal to lingering doubt by providing "significant corroboration of the otherwise problematic claim by appellant that he had consensual relations with Mrs. Sammons." Because we have concluded that the note was properly excluded, this claim fails.

### 6. *Penalty phase prejudice from guilt phase denial of instruction request*

As noted (see, *ante*, at pp. 1110–1111), at the guilt phase, the trial court refused to give defendant's special cautionary instruction on accomplice testimony, which quoted from a concurring opinion in *Guiuan, supra*, 18 Cal.4th 558, 576. Defendant argues that if we conclude that the refusal was erroneous, then we should find the lack of the instruction prejudicial at the penalty phase on the issue of lingering doubt. As we have explained, the special instruction was properly refused. Furthermore, to have the jury consider the special instruction at the penalty phase, defense counsel was required to request it as part of the penalty phase instructions, which counsel

did not do. Moreover, although defense counsel at the penalty phase made various arguments to the jury as to why it should entertain a lingering doubt, he never argued that the jurors should disbelieve Charlie Sammons (the murder victim's husband) because he was an accomplice. Defendant's claim is therefore both forfeited and meritless.

### 7. Challenges to the death penalty law

Defendant raises various challenges to California's death penalty law. We have in the past rejected similar claims, and we do so again here, as follows:

The homicide and death penalty statutes adequately narrow the class of murders eligible for the death penalty; this scheme is not overbroad because it permits capital exposure for many first degree murders, including unintentional felony murder. (*People v. Boyer, supra,* 38 Cal.4th 412, 483.)

The jury need not find beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating ones or that the death penalty is appropriate. (*People v. Chatman* (2006) 38 Cal.4th 344, 409 [42 Cal.Rptr.3d 621, 133 P.3d 534].)

The Eighth and Fourteenth Amendments to the federal Constitution do not require that a jury unanimously find the existence of aggravating factors. (*People v. Hoyos* (2007) 41 Cal.4th 872, 926 [63 Cal.Rptr.3d 1, 162 P.3d 528].)

The absence of intercase proportionality review does not violate the Eighth and Fourteenth Amendments to the United States Constitution. (*People v. Cook* (2007) 40 Cal.4th 1334, 1368 [58 Cal.Rptr.3d 340, 157 P.3d 950]; *People v. Moon* (2005) 37 Cal.4th 1, 48 [32 Cal.Rptr.3d 894, 117 P.3d 591]; see also *Pulley v. Harris* (1984) 465 U.S. 37, 50–51 [79 L.Ed.2d 29, 104 S.Ct. 871] [federal Const. does not require intercase proportionality review].)

### 8. Cumulative effect of penalty phase errors

Defendant contends that the cumulative effect of the asserted penalty phase errors requires reversal of his conviction, even if none of the errors is prejudicial individually. Because we conclude there were no errors in the penalty phase, we reject defendant's claim that any cumulative effect warrants reversal.

### III. Disposition

The judgment is affirmed.

George, C. J., Baxter, J., Werdegar, J., Chin, J., Moreno, J., and Corrigan, J., concurred.

Appellant's petition for a rehearing was denied December 15, 2010, and the opinion was modified to read as printed above.