Filed 9/29/20  P. v. Ramirez CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>CANSIO SANTIAGO RAMIREZ,<br><br>    Defendant and Appellant. | C088165<br><br>(Super. Ct. No. 17FE015184) |

While watching a fistfight between two men, defendant Cansio Santiago Ramirez walked up behind one of the combatants, stuck a gun in his back, and fired a single shot, killing him.  A jury found defendant guilty of first degree murder (Pen. Code, § 187, subd. (a))[1] and found true the allegation that he personally discharged a firearm causing death (§ 12022.53, subd. (d)).  The trial court sentenced defendant to an aggregate term of 50 years to life in prison.

On appeal, defendant contends the judgment should be reversed because (1) the trial court erred by denying his motion to suppress statements obtained in violation of his

---

[1]    Undesignated statutory references are to the Penal Code.

1

rights under *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694] (*Miranda*); (2) the trial court erred by excluding exculpatory evidence related to his state of mind at the time of the shooting; (3) the trial court erred by instructing the jury with a modified version of CALCRIM No. 3472; (4) the trial court erred by failing to instruct the jury on the lesser included offense of voluntary manslaughter based upon a sudden quarrel or heat of passion; (5) there is insufficient evidence of premeditation and deliberation to support a first degree murder conviction; and (6) the cumulative effect of these errors resulted in an unfair trial. Relying on *People v. Dueñas* (2019) 30 Cal.App.5th 1157, defendant also argues that the trial court erred in imposing fines, fees, and restitution without first determining his ability to pay them.

Because we agree with defendant's first contention, we reverse the judgment and remand for a new trial.

FACTUAL AND PROCEDURAL BACKGROUND

*The shooting*

On the morning of August 15, 2017, defendant arrived at an auto repair shop intending to sell various items, including a semiautomatic handgun, to mechanic R.B., an acquaintance who worked at the shop. Although R.B. declined to purchase the items, he agreed to give defendant $20 because he knew defendant was experiencing financial difficulties. Taking the money but not the gun or a loaded magazine, defendant then left the shop, explaining that he would return shortly.

About 15 minutes after defendant left, the victim, Arnulfo Soto, arrived at the shop, accompanied by his friend, A.B. The victim had come to the shop to speak with R.B. about a disagreement over the purchase of a truck. When the victim entered the shop, he walked over and stood next to the vehicle on which R.B. was working. The victim and R.B. exchanged greetings in a normal, casual conversation. As they were talking, the victim saw defendant's handgun, picked it up, inserted the magazine, and playfully pointed it at R.B., stating, " 'I'm going to shoot you.' " R.B. told the victim to

2

stop playing and put the gun down. As the victim did so, the gun slid and fell down into the vehicle's engine compartment.

At some point, the conversation between the victim and R.B. became heated and they began arguing loudly. The victim became "very, very angry." When R.B. refused to give the victim any money and demanded that he leave the shop, the victim told R.B. that he was going to shoot him and tried to reach defendant's gun. In an effort to defuse the situation and avoid being shot, R.B. proposed a fistfight. The victim agreed and the two of them squared off and prepared to fight in the open area of the garage.

Just before the fight began, defendant returned to the shop. Defendant asked what was happening and R.B. told him they were about to fight. R.B. yelled to defendant, " 'Your gun, it's already loaded. . . . Look for it and grab it.' " R.B. and the victim then began fighting, striking each other with their open hands and fists. Neither man had or used a weapon and no one else was involved in the fight.

At one point during the fight, R.B. elbowed the victim in the head and the victim fell to the ground. While the victim was down, defendant yelled, " 'Fuck him over,' " or " 'Fuck him up,' " which R.B. took as encouragement to "continue hitting [the victim.]"

After the victim was knocked down, the fighting became more intense. The victim seemed angrier and more intent on hurting R.B. As the fight continued, R.B.— who had never fought before—grew fatigued, so he hunched over, closed his eyes, and covered his head with his hands to protect himself. As the victim continued punching R.B., defendant racked the slide of his gun, quickly walked up behind the victim, placed his gun in the victim's back, and shot him. The bullet entered the victim's midback and moved almost horizontally from back to front, cutting his spinal cord in half, continuing up through the chest and esophagus, piercing both sides of his heart, and exiting his chest. The victim died shortly thereafter. The entire fight lasted approximately two or three minutes.

*Defendant's postshooting statements*

Immediately after shooting the victim, defendant turned to the victim's friend, A.B., and, while making a sweeping gesture across his abdomen with the gun in his hand, said, " 'What about you?' " A.B. put his hands up and over his head and said, " 'No, nothing.' " Feeling threatened, A.B. backed out of the garage and began to flee. Defendant briefly chased after him.

As soon as defendant left the shop, R.B. called 911. While R.B. was on the phone with the 911 dispatcher, defendant returned to the shop, saw R.B. on the phone, and asked, " 'What are you doing?' " R.B., too scared to tell defendant that he was speaking with the police, said "nothing" at first, but then asked defendant, " 'Why did you do this? Why would you do this?' " In regards to R.B. being on the phone, defendant told him he did not " 'want another dead person here.' " Defendant asked R.B. to help him dump the body, but R.B. refused and told defendant to leave. Before leaving, defendant warned R.B. not to talk to the police or defendant would "fuck [him] up or kill [him]."

*The police investigation*

That evening, detectives interviewed R.B. and A.B., both of whom identified defendant as the shooter.[2] Around midnight, law enforcement officers located defendant and arrested him. When defendant was arrested, he was carrying a semiautomatic handgun, which later was identified by R.B. and A.B. as the weapon used to kill the victim. Samples taken from defendant's hands tested positive for gunshot residue.

The morning after his arrest defendant was interviewed by two law enforcement officers: Detective Christopher Britton, who was leading the interview, and Detective Carlos Cabrera, who was acting as a Spanish translator for defendant. Upon entering the interview room around 5:00 a.m. on the morning of August 16, 2017, the detectives woke

---

[2]     A.B. also identified defendant in court.

defendant and asked him some background questions. They learned that he was 47 years old and born in Mexico, but had lived in the United States for more than 20 years. The detectives asked defendant if he spoke English and if he thought he could have a conversation in English, and defendant responded, "Yeah, no problem."

The detectives then turned to the topic of defendant's *Miranda* rights. The detectives asked defendant if he ever had *Miranda* rights read to him before. Despite having multiple criminal convictions, defendant stated that he had not. Detective Britton asked defendant if he would prefer to have his *Miranda* rights read to him in English or Spanish, and defendant requested Spanish. The following colloquy ensued:

"[Detective Cabrera]: [*Spanish*] Okay. As my colleague told you these are your rights, okay? First of all you have the right to remain silent, anything you say could be used against you and it is going to be used against you in the court of justice. You have the right to contact an attorney and have an attorney present before and during an inte-[*sic*] interrogation. If you do not have the resources to afford an attorney, one free of charge will be assigned to you to represent you before and during the interrogation if you want. Do you understand your rights that I just read to you?

"[Defendant]: [*Spanish*] Yes.

"[Detective Cabrera]: [*Spanish*] Okay. And having those rights in mind, uh, would you like to talk to us regarding what we investigated today?

"[Defendant]: [*Spanish*] Well, what's the thing? I didn't steal anything, I have never stolen anything.

"[Detective Cabrera]: He wants to know, uh, what incident are you referring to?

"[Detective Britton]: Okay. That's fine. We could talk about that. Um . . . .

"[Detective Cabrera]: [*Spanish*] Okay, he is going to talk about it right now, he is going to inform you.

"[Detective Britton]: So, is this okay if we talk?

"[Detective Cabrera]: [*Spanish*] Is this okay if we talk to you?

5

"[Defendant]:  [*English*] Yeah, [*Spanish*] but, (unintelligible).  I don't know, the reason is that I have not stolen anything—I have not stolen anything.

"[Detective Cabrera]:  Says he hasn't stolen anything.

"[Detective Britton]:  Okay. That's fine.

"[Detective Cabrera]:  [*Spanish*]  Um, okay.  Can we talk to you or not?  Because you just—just said something about an attorney.

"[Defendant]:  [*Spanish*]  Well, yes, I would like to have one to know what is going on because I really don't know what's going on or what . . . .

"[Detective Cabrera]:  Since he doesn't know what's going on or why he's here, um . . . .

"[Detective Britton]:  I wanna explain that to him.

"[Detective Cabrera]:  [*Spanish*]  That's—that's what we want to explain to you.

"[Defendant]:  [*Spanish*]  Should the attorney be present or not?

"[Detective Cabrera]:  [*Spanish*]  Excuse me?

"[Defendant]:  [*Spanish*]  Should the attorney be present in case I want one?

"[Detective Cabrera]:  [*Spanish*]  You—that's—that's your choice.  That's the choice and right that you have.  But as my colleague told you we want to explain to you, uh, some things.

"[Defendant]:  [*Spanish*]  Is it okay without an attorney?

"[Detective Cabrera]:  [*Spanish*]  That's your choice.  [*English*]  He's, uh, asking if it's okay to speak without an attorney.

"[Detective Britton]:  Yeah, it's absolutely okay, um, it's his choice, um, of course, you know, we would love to talk to him.  If he wants to talk, let's talk.  Um, at any time if he doesn't want to answer my questions he doesn't need to.

"[Detective Cabrera]:  [*Spanish*]  It's—it's very easy (unintelligible).  If you want to talk to us, we want to talk to you, uh, but you don't have to—that's your right to remain silent if—you can talk without the attorney being present, you [*sic*].  And at any

point of the interview if you don't want to talk anymore or you don't want to answer some of the questions you don't have to answer the . . . .

"[Defendant]: Okay.

"[Detective Cabrera]: Okay.

"[Defendant]: [*Spanish*] Let's see what—I did not steal anything.

"[Detective Cabrera]: He said, 'Yes, let's talk.'

"[Detective Britton]: Okay.

"[Detective Cabrera]: He wants to know what this is all about.

"[Detective Britton]: All right. Perfect. So, um, I'll just get right to it. Um, when you woke up to day [*sic*], where'd you go?"[3]

The detectives then proceeded to interview defendant about the shooting. During the interview, defendant denied being present when the shooting happened and denied shooting or killing anyone. Defendant told the detectives that he only heard about the shooting from a friend, that he acquired the gun after the shooting had occurred, and that he shot the gun into an empty field.

Before trial, defendant moved to suppress his statements to the police on the grounds they were obtained in violation of *Miranda* because the detectives continued to question him even after he unequivocally asked for an attorney.[4] In ruling on the motion,

---

[3]    The transcripts of the interrogation that are part of the record on appeal do not indicate which portions of the interrogation were in Spanish or English. However, since there is no dispute between the parties on this issue, we accept and use the designations set forth in the parties' briefs. Because the parties' briefs do not align in their description of nonverbal acts, we have not considered that information in reaching our decision. However, we have considered exhibits 1 and 1A, which were included in the record on appeal pursuant to California Rules of Court, rule 8.224.

[4]    Although defendant failed to renew the objection when the evidence was offered at trial, defendant argues, and we agree, that his motion to suppress was sufficient to preserve the issue for appellate review. (*People v. Morris* (1991) 53 Cal.3d 152, 189-

7

the trial court reviewed both the transcript and the videotape of the interrogation. Although the court indicated it was a "hard decision," after extensive argument from the parties and deliberation by the trial court, it ultimately affirmed its tentative decision to deny the motion, concluding that defendant had not unequivocally and unambiguously asserted his right to counsel. The prosecution subsequently relied on defendant's false statements to the police to show consciousness of guilt, and to show that defendant's claimed defense of another was false and that defendant's true motive for the shooting was to ensure R.B. did not lose the fight.

*The defense*

Defendant did not testify and the defense presented no witnesses. The defense conceded that defendant shot the victim, but argued that he did so in defense of R.B.

*Verdict and sentencing*

The jury found defendant guilty of a single count of first degree murder (§ 187, subd. (a)) and found true the allegation that he intentionally and personally discharged a firearm causing death in violation of section 12022.53, subdivision (d). The trial court declined to strike the firearm enhancement. Defendant was sentenced to 50 years to life in prison, consisting of 25 years to life for the murder and a consecutive 25 years to life for the firearm enhancement. The court ordered defendant to pay $12,623.50 in direct victim restitution (with an additional amount to be determined for funeral and mental health expenses); a $10,000 restitution fine under section 1202.4, subdivision (b), with a like amount (stayed) under section 1202.45; a $30 court facilities assessment under Government Code section 70373; a $40 court operations assessment under section 1465.8; and $544.27 in booking and classification fees under Government Code section 29550. Defendant timely appealed.

---

190, overruled in part on other grounds in *People v. Stansbury* (1995) 9 Cal.4th 824, 830, fn. 1.)

DISCUSSION

I

*Violation of* Miranda

Defendant argues the trial court erred in refusing to suppress the statements he made during his police interview because they were obtained in violation of *Miranda*. Defendant asserts that he unequivocally invoked his right to counsel and that, as soon as he did so, all questioning should have ceased. Defendant also argues that he did not fully understand his *Miranda* rights and therefore did not knowingly and intelligently waive them. Based upon our independent review of the record, and the totality of the circumstances, we agree that the statements were obtained in violation of *Miranda* and therefore should have been suppressed. We further conclude the error was prejudicial and requires reversal of the judgment.

In *Miranda*, the United States Supreme Court established a number of prophylactic rights designed to protect the privilege against self-incrimination during custodial interrogations. (*Davis v. United States* (1994) 512 U.S. 452, 457-458 [129 L.Ed.2d 362, 370-371] (*Davis*); *Miranda, supra*, 384 U.S. 436.) Under *Miranda*, a suspect may not be subjected to custodial interrogation unless the suspect has been apprised of his or her rights and has knowingly, intelligently, and voluntarily waived them. (*People v. Bacon* (2010) 50 Cal.4th 1082, 1104-1105 (*Bacon*).)

The right to counsel is one of the prophylactic rights recognized in *Miranda* to be sufficiently important to require the " 'special protection' " of the knowing and intelligent waiver standard. (*Davis, supra*, 512 U.S. at p. 458.) If a suspect knowingly and voluntarily waives his right to counsel after having that right explained to him, law enforcement officers are free to question the suspect. (*Ibid*.; see also *Berghuis v. Thompkins* (2010) 560 U.S. 370, 384 [176 L.Ed.2d 1098, 1113] ["Where the prosecution shows that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain

9

silent"].) But when a suspect has invoked a right to have counsel present during an interrogation, a valid waiver of that right cannot be established merely by showing that the suspect responded to further interrogation. (*Edwards v. Arizona* (1981) 451 U.S. 477, 484 [68 L.Ed.2d 378, 386].) When a suspect has expressed a desire to deal with police only through counsel, the interrogation must cease until either counsel has been made available or the suspect reinitiates the conversation. (*Id.* at pp. 484-485; *Davis*, at p. 458; *Bacon, supra*, 50 Cal.4th at p. 1105.)

The rule that the interrogation must cease applies only when there has been a clear invocation of the right to counsel. (*People v. Gonzalez* (2005) 34 Cal.4th 1111, 1124 (*Gonzalez*); *Davis, supra*, 512 U.S. at pp. 460-461.) An officer is not required to stop questioning a suspect when a suspect makes a reference to an attorney that is ambiguous or equivocal. (*People v. Flores* (2020) 9 Cal.5th 371, 417; *People v. Sauceda-Contreras* (2012) 55 Cal.4th 203, 217-218 (*Sauceda-Contreras*); *Davis*, at pp. 459, 461; see also *People v. Carey* (1986) 183 Cal.App.3d 99, 103 [the " 'clarification rule' " requires ambiguity as a precedent].)

Whether a defendant has invoked the right to an attorney is an objective inquiry that asks what a reasonable officer would have understood the nature of the suspect's request to be under the circumstances. (*Sauceda-Contreras, supra*, 55 Cal.4th at pp. 217-218; *Davis, supra*, 512 U.S. at p. 459.) Although a suspect " 'need not "speak with the discrimination of an Oxford don," [citation], he must articulate [the] desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney.' " (*Gonzalez, supra*, 34 Cal.4th at p. 1124.)

Context is important. In certain situations, words that would be plain if taken literally actually may be equivocal in the context of the request or the circumstances leading up to it. (*Sauceda-Contreras, supra*, 55 Cal.4th at p. 218.) However, in determining whether a request for counsel is ambiguous, a suspect's subsequent

10

responses to continued police questioning may not be used to cast retrospective doubt on the clarity of the initial request. (*Smith v. Illinois* (1984) 469 U.S. 91, 99-100 [83 L.Ed.2d 488, 496] (*Smith*).) "Where nothing about the request for counsel or the circumstances leading up to the request would render it ambiguous, all questioning must cease." (*Id*. at p. 98.) In these circumstances, the accused's subsequent statements are relevant only to the distinct question of waiver. (*Ibid*.)

In reviewing a trial court's *Miranda* ruling, we independently determine from the undisputed facts, and facts properly found by the trial court, whether the challenged statement was illegally obtained, and where what the defendant said during the interview is undisputed, we review de novo the legal question of whether the statement at issue was ambiguous or equivocal. (*Bacon, supra*, 50 Cal.4th at p. 1105; *People v. Cunningham* (2001) 25 Cal.4th 926, 992.)

Here, defendant argues that he unambiguously and unequivocally requested an attorney to help him understand what was happening during the interview. We agree.

Immediately after confirming that defendant understood the *Miranda* advisement, detectives asked him if he would like to talk to them regarding the incident they were investigating. At that point, the detectives had not yet told defendant the nature of what they were investigating, except that it was an "incident" in which "somebody was seriously hurt." Defendant's response indicated his confusion about what incident was being investigated: "Well, what's the thing? I didn't steal anything."

Detective Cabrera replied that they would explain if defendant agreed it was okay to talk. Defendant answered, "Yeah, but," and then apparently said "something about an attorney," which was not directly translated by Cabrera. Detective Cabrera then asked defendant, "Can we talk to you or not? Because you . . . just said something about an attorney." To that, defendant responded, "Well, yes, I would like to have one to know what is going on . . . ."

11

The People argue that defendant's response was ambiguous because he "actually answered 'yes' to the only pending question:  'Can we talk to you or not?' "  We are unpersuaded.[5]  Construed in context, the objectively reasonable interpretation of the detective's question was:  "Can we talk or [do you want an attorney]?"  In response to this question, defendant answered that, "[Y]es, [he] would like to have one."

Defendant's request for counsel differs markedly from responses that have been found to be ambiguous or equivocal.  Defendant did not say he "might" want an attorney, that he "thinks" he would like an attorney, or that "maybe" an attorney should be present.  (Cf. *Bacon, supra*, 50 Cal.4th at p. 1104 [" 'I think it'd probably be a good idea for me to get an attorney' " was ambiguous or equivocal]; *Davis, supra*, 512 U.S. at pp. 461-462 [" 'Maybe I should talk to a lawyer' " was ambiguous or equivocal].)  He did not say that he would " 'feel more comfortable' " with a lawyer present.  (*People v. Molano* (2019) 7 Cal.5th 620, 659.)  And his request for counsel was not contingent on a future event.  (Cf. *Gonzalez, supra*, 34 Cal.4th at pp. 1119, 1126 [defendant's statement that he wanted a lawyer *if* he was going to be charged was conditional]; *People v. Suff* (2014) 58 Cal.4th 1013, 1068-1069 [same]; *People v. Clark* (1992) 3 Cal.4th 41, 120-121, abrogated on another ground as recognized in *People v. Edwards* (2013) 57 Cal.4th 658, 704-705 [expressed desire to have attorney present in future coupled with unequivocal willingness to talk in the interim].)  Immediately after Detective Cabrera referred to an attorney, defendant responded, "[Y]es, I would like to have one."  We do not find this request to be equivocal or ambiguous.

Our conclusion finds support in the United States Supreme Court's decision in *Smith, supra*, 469 U.S. 91.  In *Smith*, after a detective advised the defendant of his right to have a lawyer present during questioning and asked if he understood that right, the

---

**5**     Nor are we persuaded that defendant's response was ambiguous because he denied stealing anything before requesting an attorney.

defendant responded, " 'Uh, yeah. I'd like to do that.' " (*Id*. at p. 93, italics omitted.) Instead of immediately terminating the questioning, the interrogating officers finished reading the defendant his *Miranda* rights and asked him if he wished to talk without a lawyer being present. (*Smith*, at p. 93.) The defendant responded, " 'Yeah and no, uh, I don't know what's what, really.' " (*Ibid*., italics omitted.) Officers then told the defendant, " 'You either have [to agree] to talk to me this time without a lawyer being present and if you do agree to talk with me without a lawyer being present you can stop at any time you want to,' " to which defendant responded, " 'All right. I'll talk to you then.' " (*Ibid*., italics omitted.)

Based on these facts, the Supreme Court concluded that the trial court erred in refusing to suppress the defendant's custodial statements. (*Smith, supra*, 469 U.S. at pp. 91-92.) Finding no ambiguity in the defendant's initial request for counsel, the court held that the questioning should have ceased. (*Id*. at pp. 97-98.) The court held that the accused's postinvocation statements could not be used for the purpose of injecting ambiguity into the invocation statement. (*Id*. at p. 100.)

The facts of *Smith, supra*, 469 U.S. 91 are closely analogous to the facts here. Here, as in that case, in response to a question referring to an attorney, defendant stated that he "would like" one. Nevertheless, because the translating detective failed to translate this portion of his response, or halt the interrogation himself, the other detective pressed forward with additional questioning. As in *Smith*, defendant's responses to continued questioning ultimately were used for the purpose of retroactively injecting ambiguity into his earlier invocation.[6]

---

**6** Although the additional questioning may not have amounted to interrogation (*People v. Cunningham, supra*, 25 Cal.4th at p. 993), clarifying questions are permitted only if the request for counsel was ambiguous or equivocal. (*People v. Carey, supra*, 183 Cal.App.3d at p. 103; *Garcia v. Long* (9th Cir. 2015) 808 F.3d 771, 778; see also *Davis,*

13

Under the totality of the circumstances, including the translation problems, we conclude that defendant's statement, "[Y]es, I would like to have one," was an unambiguous and unequivocal request for an attorney.[7]  Because the officers continued to interrogate him after he invoked his right to counsel, and it is undisputed that defendant did not reinitiate the conversation, we conclude defendant's custodial statements were obtained in violation of *Miranda*.  (*Davis, supra*, 512 U.S. at p. 458; *In re Art T.* (2015) 234 Cal.App.4th 335, 355-356.)  Thus, the trial court erred in denying defendant's motion to suppress such evidence.[8]  (See *People v. Neal* (2003) 31 Cal.4th 63, 67, 90; *People v. Guerra* (2006) 37 Cal.4th 1067, 1092, overruled on other grounds as stated in *People v. Rundle* (2008) 43 Cal.4th 76, 151, overruled on other grounds as stated in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

When statements are obtained in violation of *Miranda*, as they were in this case, the error is reviewed under the federal "harmless beyond a reasonable doubt" standard set forth in *Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705].  (*In re I.F.* (2018) 20 Cal.App.5th 735, 781.)  Under *Chapman*, the test is whether it appears beyond a

---

*supra*, 512 U.S. at p. 459, *Smith, supra*, 469 U.S. at pp. 95-100, and *People v. Gamache* (2010) 48 Cal.4th 347, 385.)

[7]     Given this conclusion, we find *People v. Flores, supra*, 9 Cal.5th 371, on which the People rely, factually distinguishable.  There, our Supreme Court held that a police officer acted reasonably in clarifying defendant's intent to invoke his right to counsel after an ambiguous response to an imprecise question posed by the officer.  (*Id.* at p. 419.)  We find no similar ambiguity here.

[8]     This renders it unnecessary for us to decide defendant's alternative claim that he did not knowingly and intelligently waive his right to counsel because he did not fully understand his *Miranda* rights.  We also decline to consider defendant's claim, raised solely to preserve the issue for appellate review, that the California Supreme Court's decisions in *People v. Markham* (1989) 49 Cal.3d 63 and *People v. May* (1988) 44 Cal.3d 309—allowing statements obtained in violation of *Miranda* to be used for impeachment—were wrongly decided.  (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

reasonable doubt that the error complained of did not contribute to the verdict obtained. (*People v. Neal, supra*, 31 Cal.4th at p. 86.) " 'To say that an error did not contribute to the verdict is . . . to find that error unimportant in relation to everything else the [trier of fact] considered on the issue in question, as revealed in the record.' [Citation.]" (*Ibid*.) That is to say, the inquiry is whether the verdict rendered was " ' " ' surely unattributable' " ' " to the error. (*People v. Penunuri* (2018) 5 Cal.5th 126, 158.) The People bear the burden to make this showing. (*In re I.F., supra*, 20 Cal.App.5th at p. 781.) The burden is a "heavy" one. (*People v. Guzman* (2000) 80 Cal.App.4th 1282, 1290.)

The People argue that any error in admitting the *Miranda*-violative statements was harmless because the statements merely were indirect evidence of consciousness of guilt, used to show that defendant killed the victim and did not act in defense of another. They further argue that, in light of other, overwhelming evidence—including defendant's conduct immediately after the shooting—the custodial statements were unimportant. We disagree.

Although there was strong evidence that defendant was guilty of some form of criminal homicide, we cannot say beyond a reasonable doubt that the *Miranda*-violative statements did not contribute to the verdict of first degree murder.

" 'California statutes have long separated criminal homicide into two classes, the greater offense of murder and the lesser included offense of manslaughter. The distinguishing feature is that murder includes, but manslaughter lacks, the element of malice.' [Citation.]" (*People v. Randle* (2005) 35 Cal.4th 987, 994 (*Randle*), overruled on other grounds in *People v. Chun* (2009) 45 Cal.4th 1172, 1201.) " 'Malice exists, if at all, only when an unlawful homicide was committed with the "intention unlawfully to take away the life of a fellow creature" [citation], or with awareness of the danger and a conscious disregard for life [citations]. In certain circumstances, however, a finding of malice may be precluded, and the offense limited to manslaughter, even when an

15

unlawful homicide *was* committed with intent to kill.' " (*Randle, supra*, at pp. 994-995, fn. omitted.)

One acting in perfect defense of another has a complete defense to a charge of murder. A killing committed in perfect defense of another—which requires both an actual and a reasonable belief in the need to defend another—is "neither murder nor manslaughter; it is justifiable homicide." (*Randle, supra*, 35 Cal.4th at p. 994.) In contrast, "one who kills in imperfect defense of others—in the actual but unreasonable belief he must defend another from imminent danger of death or great bodily injury—is guilty only of manslaughter." (*Id.* at p. 997.) Imperfect defense of another mitigates rather than justifies the homicide by negating the element of malice, the mental element necessary for murder. (*Id.* at pp. 994, 996-997; *In re Christian S.* (1994) 7 Cal.4th 768, 773.)

The evidence in this case established that defendant did not have an objectively reasonable belief in the need to use deadly force. But we cannot say that defendant's inadmissible statements were unimportant to the question of whether defendant shot the victim based upon an actual, albeit *unreasonable*, belief in the need to defend R.B.

Throughout closing argument, the prosecutor emphasized defendant's false statements to the police. Indeed, she began and ended her argument by noting the inconsistency between what defendant told the detectives during his interrogation—that he did not shoot the victim—and what defendant claimed at trial—that he shot the victim in defense of another. The prosecutor used this evidence not merely as proof of consciousness of guilt, but also to show that defendant's claimed defense of another was false and that defendant's true motive was to ensure R.B. won the fight.

The People urge us to conclude that the illegally obtained statements played only a minor role in the jury's verdict. But, as defendant argues, the jury only had "one opportunity to hear [defendant] speak," and that one statement was shown to be a lie, which seriously damaged the credibility of his claimed defense of another. The

16

importance of this evidence was underscored in closing argument, when the prosecution repeatedly referred the jury to the videotape of defendant's interrogation and insisted that defendant's lies to the police cannot be ignored. We cannot conceive of any reason "why we should treat this evidence as any less 'crucial' than the prosecutor—and so presumably the jury—treated it." (*People v. Cruz* (1964) 61 Cal.2d 861, 868; *People v. Diaz* (2014) 227 Cal.App.4th 362, 384 [concluding that a prosecutor's reference to evidence that should not have been admitted increases the potential prejudice of that evidence].)

We cannot say beyond a reasonable doubt that the statements obtained in violation of *Miranda* did not contribute to the jury's verdict. The People have failed to meet their burden to prove the error was harmless. Accordingly, we conclude that the judgment must be reversed.

## II

### *Exclusion of Exculpatory Statement*

Our determination that defendant's murder conviction must be reversed renders it unnecessary for us to consider his other claims of error. For guidance upon retrial, however, we briefly address the contention that the trial court erred by excluding an exculpatory statement made by defendant at the time of the shooting.

During trial, the prosecution elicited testimony from R.B. about a series of incriminating statements that defendant made to R.B. shortly after the shooting, including that defendant asked R.B. to help him move the body and threatened to harm R.B. if he talked to the police. While the prosecution was questioning him, R.B. volunteered that at some point during their exchange he asked defendant, " 'Why did you do this?' " But the prosecution did not elicit defendant's answer to this question.

Thereafter, defense counsel informed the court that he intended to elicit, on cross-examination, defendant's answer to R.B.'s question of why he shot the victim. Specifically, R.B. would testify that defendant answered, " 'Because he was fucking you

17

up.' " Defense counsel argued that defendant's statement, although hearsay, was admissible under Evidence Code section 356 or section 1240.[9] The prosecution opposed the request.[10]

After holding an Evidence Code section 402 hearing and receiving additional argument, the court agreed with the prosecution and excluded defendant's statement as inadmissible hearsay. As a result, the jury never heard defendant's explanation of why he shot the victim.

On appeal, defendant argues that the trial court erred by excluding defendant's answer to the question why he shot the victim. He contends the statement was admissible under Evidence Code section 356 or 1240, and that excluding the statement impaired his constitutional right to present a defense. We agree that the statement should have been admitted under Evidence Code section 356.

Evidence Code section 356 provides that when part of a conversation, act, declaration, or writing, is given in evidence by one party, "the whole on the same subject may be inquired into by an adverse party . . . ." (Evid. Code, § 356.) The purpose of the rule is "to prevent the use of selected aspects of a conversation, act, declaration, or writing, so as to create a misleading impression on the subjects addressed." (*People v. Arias* (1996) 13 Cal.4th 92, 156.) Under the rule, if a statement admitted in evidence constitutes part of a conversation, the adverse party may introduce otherwise inadmissible portions of the same conversation that have " 'some bearing upon, or connection with' "

---

[9]     Defense counsel also sought to admit the statement under Evidence Code section 1250 or 1251. The trial court ruled the statement was not admissible under those sections. Defendant does not challenge that ruling on appeal.

[10]     The prosecution reminded the court that before trial, the court had tentatively granted a motion in limine to preclude defendant's out-of-court statements unless defendant testified or the prosecution moved to admit them.

the admitted statement to avoid creating a misleading impression of the conversation. (*People v. Hamilton* (1989) 48 Cal.3d 1142, 1174, italics omitted.)

We review a trial court's ruling under Evidence Code section 356 for abuse of discretion. (*People v. Parrish* (2007) 152 Cal.App.4th 263, 274.) Here, we find an abuse of discretion for three reasons.

First, the excluded statement was made at the same time and as part of the same conversation with R.B. as the other postshooting statements that were admitted. This is not a situation, as in *People v. Johnson* (2010) 183 Cal.App.4th 253, where the defendant was seeking to use exculpatory statements from a later conversation to explain statements made in a previous, separate conversation. (*Id*. at p. 287.)

Second, the excluded statement was on the "same subject" as the admitted statements. The postshooting statements admitted at trial included (1) defendant asking R.B. who he was speaking to on the phone; (2) defendant asking R.B. to help him move the victim's body; (3) defendant warning R.B. not to talk to the police; and (4) R.B. asking defendant, "Why did you do this? Why would you do this?" All of these statements were made close in time, related directly to the shooting and its immediate aftermath, and the excluded statement was a direct response to R.B.'s question about why defendant shot the victim.

We acknowledge that Evidence Code section 356 cannot be applied mechanically, but our Supreme Court has cautioned that courts should not draw " 'narrow lines' " around the subject of the inquiry. (*People v. Zapien* (1993) 4 Cal.4th 929, 959; *People v. Williams* (1975) 13 Cal.3d 559, 565; see also *People v. Harrison* (2005) 35 Cal.4th 208, 239.) Following this guidance, we are persuaded that the excluded statement was on the same subject, i.e., defendant's postshooting conduct and statements to R.B.

Third, defendant's explanation as to why he shot the victim had some bearing upon, or connection with, the statements admitted in evidence, and was necessary to avoid creating a misleading impression of the conversation. (*People v. Hamilton, supra,*

19

48 Cal.3d at p. 1174.) The prosecution elicited the other postshooting statements partly to establish defendant's motive for the shooting. The prosecution relied on the statements to show that defendant shot the victim not because he believed R.B. was in imminent danger, but because he wanted R.B. to win the fight.

In contrast, only one part of the conversation was kept from the jury's consideration—the statement that answered R.B.'s question: "Why did you do this?" By admitting all of defendant's postshooting statements except that one, the trial court deprived the jury of hearing the response to the question. Instead, the jury was left with the misimpression that defendant had no answer to the question when, in fact, he did. The jury should not have been misled into believing defendant had no response to the question of why he shot defendant, a circumstance the jury likely took into account in considering the prosecution's consciousness of guilt argument. Thus, we conclude the trial court erred in excluding it.

## DISPOSITION

The judgment is reversed and the case remanded to the trial court for a new trial.

                                      KRAUSE         , J.

We concur:

      ROBIE          , Acting P. J.

      MURRAY       , J.